PATRICIA SEMROW, Plaintiff and Defendant-Appellant, *v.* HARMSWOOD STABLES NORTH, INC., Defendant and Plaintiff-Appellee.

First District (4th Division)    No. 80-1567

Opinion filed September 10, 1981.

William J. Stevens, of Foss, Schuman & Drake, of Chicago, for appellant.

Edward J. Egan, Ltd., of Chicago, for appellee.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Appellant, Patricia Semrow, brought an action in forcible entry and detainer against appellee, Harmswood Stables, North, Incorporated (Harmswood). Pursuant to an installment agreement for warranty deed Harmswood was a contract purchaser from Semrow of real estate improved with a riding stable. Semrow claimed a forfeiture under the contract because Harmswood allegedly failed to keep the buildings and improvements on the land in good repair and because Harmswood had committed waste on the property. Prior to the filing of this suit Harmswood filed an action against Semrow for breach of the same contract. That suit was dismissed on Semrow's motion, and Harmswood subsequently filed an amended complaint for declaratory judgment and other relief. In that amended complaint Harmswood alleged, *inter alia*, that

Semrow had refused to sign certain documents necessary for Harmswood to receive a Small Business Administration (SBA) disaster loan. The proceeds were for repair of damage caused by a severe snowstorm. Harmswood sought a finding that Semrow's refusal constituted a breach of an implied condition of the contract, that she not interfere with Harmswood's efforts to repair the buidlings. The two suits were consolidated for trial. The trial court denied Semrow's motion for judgment on the pleadings on Harmswood's amended complaint, but after all the evidence on both actions was heard before a jury the court directed a verdict for Semrow on Harmswood's action. The jury then entered a verdict for Harmswood on Semrow's suit, denying Semrow the right to possession, and judgment was entered on the verdict.

· On appeal Semrow contends: (1) the jury verdict was contrary to the manifest weight of the evidence; (2) the trial court erred in denying Semrow's motion for judgment on the pleadings; (3) the jury was incorrectly instructed on the defense of impossibility.

We affirm.

The pertinent evidence at trial was as follows. Semrow purchased the property from Don Peebles in October 1975. Shortly thereafter Harmswood entered the property under an option to purchase. That option was exercised on April 3, 1976, by a contract which provided, *inter alia*, that:

"3. Purchaser [Harmswood] shall keep the buildings and improvements on the premises in good repair and shall neither suffer nor commit any waste on or to the premises, and if Purchaser fails to make any such repairs or suffers or commits waste Seller [Semrow] may elect to make such repairs or eliminate such waste and the cost thereof shall become an addition to the purchase price immediately due and payable to Seller, with interest at seven (7) Per Cent per annum until paid.

\* \* \*

11. In case of the failure of Purchaser to make any of the payments, or any part thereof, or perform any of Purchaser's covenants hereunder, this agreement shall, at the option of Seller, be forfeited and determined, and Purchaser shall forfeit all payments made on this agreement, and such payments shall be retained by Seller in full satisfaction and as liquidated damages by Seller sustained, and in such event Seller shall have the right to reenter and take possession of the premises aforesaid.

\* \* \*

15. The remedy of forfeiture herein given to Seller shall not be exclusive of any other remedy, but Seller shall, in case of default or breach, or for any other reason herein contained, have every other remedy given by this agreement or by law or equity, and shall have

the right to maintain and prosecute any and every such remedy, contemporaneously or otherwise, with the exercise of the right of forfeiture, or any other right herein given."

On August 24, 1979, Semrow served on Harmswood a notice of intent to declare a forfeiture under the contract. That notice specified the following breaches of the agreement:

"* * * Purchaser has failed to keep the buildings and improvements on the said real estate in good repair and has suffered and committed waste thereon, in that:

(a) the roof of the main stable building over the show room arena has collapsed and has remained unrepaired for over six months;

(b) the outer stall area which was located along the southern wall of the western portion of the main stable building has been destroyed and has remained unrepaired and unreplaced for many months;

(c) parts of the ceilings in the main stable building have fallen in and have remained unrepaired for many months;

(d) the operating system servicing the various buildings (including the electrical and plumbing systems) have become broken down and been rendered useless in significant part and have remained unrepaired for many months;

(e) the structural parts and supports of the various buildings have become weakened, decayed and materially damaged and have remained unrepaired for many months;

(f) the small living quarters structure located immediately to the northwest of the main stable building has been abandoned and become thoroughly dilapidated; and

(g) all of the various buildings and improvements have on the whole become run-down and deteriorated, requiring extensive repairs and maintenance which have been wanting for many months."

Harmswood was given until October 1, 1979, to make the necessary repairs and replacements. On October 2, 1979, Semrow recorded a declaration of forfeiture which was also served on Harmswood.

Appellant Semrow testified that in August 1975 when she purchased the property its general condition was good. The riding area roof was in excellent shape, the outer stall on the main stable building was in good shape, the ceilings were intact, and the electrical and plumbing fixtures were in good working order. None of the living quarters on the premises were unoccupied. However, by mid-August, 1979, the riding arena roof was "gone," the main stable was unusable, with debris all over, and there were holes in the ceilings and walls. The plumbing was unusable and

although the electrical system still worked it was dangerous, with wires hanging loose. The living quarters in the main stable building were also completely unusable. According to Semrow, between August 1979 and October 1979 no repairs had been made.

Other witnesses for the plaintiff generally corroborated this testimony, with the following significant variations or additions. William Tinkel, a real estate broker who had negotiated the sale of the property, testified that at the time of the sale the condition of the property was fair. He conceded that the main stable could have used some shoring up of the structural parts and supports, but added that with proper maintenance it would still have been there. According to Tinkel there were three dwelling areas on the premises: two houses and one section of the main stable. At the time of the sale all were being lived in. By mid-1979, the only living quarters that were serviceable were those in one house occupied by a maintenance man. Frances Bohle, who had been familiar with the property since 1970, testified that since Harmswood took over there had been a steady deterioration in the main stable which had accelerated in the last two or three years. Ceilings were leaking, and the stalls were not kept in repair. Jean Stevens, who had been familiar with the property since 1961, testified that when the riding area roof collapsed in the snows of January 1979, it also took away one whole inside wall.

On cross-examination Semrow testified that Harmswood was not in arrears on its payments and she had accepted all those payments. She had visited the property over a hundred times since 1975. She first notified Harmswood of her displeasure with the state of the property in August 1979. Semrow never attempted to make the repairs herself and bill the defendant as the contract permitted. She conceded that the riding arena roof collapsed with the snow of January 1979, but maintained that the collapse of the roof on the adjoining main stable preceded the snowstorm. On redirect examination Semrow stated that when she accepted the payments from Harmswood she did not intend to give up her right to have Harmswood maintain the property.

Architect Daniel Lyne inspected the property for Harmswood. He testified that the Quonset hut enclosing the riding arena was probably 20 to 40 years old and was not designed to support a heavy load. The building did not appear to have been maintained for over 10 years. Its galvanized steel, if left unpainted, would rust, and this in turn could weaken the structure. He had seen some rust on the building. It was Lyne's opinion that the building was never designed to withstand the amount of snow it received in January 1979. Indeed, he believed that no amount of maintenance by Harmswood would have prevented the damage. According to Lyne, even had the building been new it might have collapsed under the snow load of that winter.

Lyne also inspected the main stable adjoining the riding arena. The stable was about 50 years old and was constructed of wood. The wood had never been treated; the critical time for such treatment was the first 10 years. It had suffered from water damage over the years and was in a final state of decay. It was his opinion that the huge snow load of January 1979 had caused the collapse of the stable's roof.

Everett McMahon, Morton Grove Building Commissioner, testified that he believed the collapse of the two roofs was due to snow. It was his opinion that the two buildings could not be rebuilt to comply with the applicable building code.

Allen Yore, a licensed architect, also testified that neither building could be repaired to comply with the building code. He also did not believe that the riding arena building could be repaired in any event because the material used when it was first built would be difficult to locate. In his opinion, the Quonset structure over the riding arena could not have withstood the weight of the snow even if the building had been new.

Larry Horn had lived on the property for 12 years. During the last six months before Harmswood took over Horn lived in a residence in the back of the property. That building was not then in good shape. There were holes in the walls and the floor had shifted. After he moved out of that residence it was shut down; the water, heat, and electricity were disconnected. Horn testified to numerous repairs he had made on the Harmswood property since 1975. These included putting new electrical wiring in the riding arena, repairing its walls, and replacing broken boards. According to Horn, the residence area of the main stable was occupied until the collapse of the lean-to adjoining it. It was his opinion that the rotting walls of the main stable could not be repaired; the whole building would have to be replaced.

Bryan Tadish, a handyman at Harmswood, also testified to having done repairs on the main stable since 1975. These included carpentry work, fixing stalls, and making some repairs to walls. He described the condition of the residence Horn had moved out of as very poor in 1975 and the same currently.

Daniel Mackevich, an executive with E. F. Hutton, had boarded horses on the property since 1975. He had observed repairs made on a continuous basis. When portions of the stable came into a state of disrepair they would be taken care of immediately. As to the plumbing, he testified that until the collapse of the stable roof the toilet in that structure had been working.

Also testifying for defendant was its president, Robert Levy. He recalled that when he took over the premises the riding arena structure and the main stable were in dire need of repair. The residence in which Horn and his family were living was not fit as a residence. The windows

were not thick enough, there were holes in the walls, and there was insufficient heat. Horn moved into a residence at the front of the property, and Levy shut off the utilities for the old house, locking it up so no one could get in.

According to Levy the Quonset roof collapsed on or about January 2, 1979. The main stable roof collapsed about a week later. Over the years he had made many minor repairs on the premises, doing whatever was necessary. After the collapse of the roofs Levy had several conversations with Semrow about obtaining a snow disaster loan. He had been unable to make repairs to the Quonset structure after he had met with Morton Grove officials. Levy applied for an SBA disaster loan in March 1979. The loan was approved, but he was unable to obtain the money because Semrow refused to sign certain loan documents. The village of Morton Grove indicated informally that if Levy submitted the proper plans to them they would be approved. Levy also testified that he was current in his payments to Semrow.

Defendant Harmswood also introduced the testimony of Vernon Weems, Jr., a branch counsel for the Small Business Administration Disaster Program. He had processed Levy's application for a loan. A $130,000 loan was approved in September 1979. However, the money was not disbursed because the owner of the property did not sign the necessary documents consenting to the loan and waiving her right to obtain her own loan for the same property.

## I

Upon review of this evidence, we find no merit to appellant Semrow's contention that the jury's verdict was contrary to the manifest weight of the evidence. There was sufficient testimony which, if believed, established that until the heavy snowfall of January 1979 Harmswood did maintain the property, making repairs as needed. The house formerly resided in by Larry Horn, which Semrow claimed had since "become thoroughly dilapidated," had, according to Harmswood's witnesses, remained in the same condition since Harmswood took over the property. It was unsuitable as a residence then and was simply boarded up to prevent unauthorized access. There is no dispute that as a result of the snowfall the main stable and the Quonset structure enclosing the riding arena both fell into disrepair. However, Harmswood contended at trial that repair had become impossible and in any event Semrow by her actions waived her right to claim a forfeiture.

■■ We first consider Harmswood's claim that performance of its duty to keep the property in repair became impossible after the heavy snowfall. A leading Illinois case on the defense of impossibility of performance is *Leonard v. Autocar Sales & Service Co.* (1945), 392 Ill. 182, 64 N.E.2d 477,

*cert. denied* (1946), 327 U.S. 804, 90 L. Ed. 1029, 66 S. Ct. 968. In that case the court stated:

> "[T]he general rule is that where parties, by their own contract and positive undertaking, create a duty or charge upon themselves, they must abide by the contract and make the promise good, and subsequent contingencies, not provided against in the contract, which render performance impossible, do not bring the contract to an end." (392 Ill. 182, 187, 64 N.E.2d 477, 479.)

However the court also indicated that one exception to this general rule is where the event causing the impossibility could not have been anticipated or guarded against in the contract. *Leonard,* 392 Ill. 182, 189, 64 N.E.2d 477, 480; see *Felbinger & Co. v. Traiforos* (1979), 76 Ill. App. 3d 725, 394 N.E.2d 1283.

■■ In this cause the jury could have found, as Harmswood argued at trial, that the extraordinary snowfall of the winter of 1978-1979 could not have been anticipated by the parties. The jury could also have believed the testimony of Harmswood's witnesses tending to establish that Harmswood could not legally have merely repaired the collapsed structures but would have had to replace them with new buildings in order to comply with the building code. Thus there was sufficient evidence from which the jury could have determined that after the snowfall of 1979 it became impossible for Harmswood to comply with its contractual obligation to repair the buildings on the land, and that impossibility and its causes were not foreseeable by the parties.

Because of our determination of this issue we need not evaluate the sufficiency of Harmswood's alternative theory at trial, that plaintiff had waived her right to claim a forfeiture.

## II

■■ The jury received the following instruction on the defense of impossibility:

> "You are instructed that the law in Illinois is as follows: That when the law cast [*sic*] a duty on a party, the performance shall be excused by an act of God, but when a party, by his own conduct, engages to do an act, it is deemed his own fault or folly that he did not expressly provide in that contract against contingencies and exempt himself from responsibility in certain events; and in such case, that is, in the instance of an absolute or a general contract, the performance is not excused by inevitable acts or other contingencies, even though the accident or other contingencies was [*sic*] not foreseen by or was [*sic*] not within the control of the party."

Appellant now contends that this instruction was incomplete in that it failed to state that it was Harmswood's duty to have used all efforts to

avoid the impossibility and to employ every alternative means of performance. But at trial Semrow never tendered her own alternative instruction on this issue and consequently she has waived it as a basis for reversal on appeal. (*Wolter v. Chicago Melrose Park Associates* (1979), 68 Ill. App. 3d 1011, 386 N.E.2d 495; Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(2)(i).) Moreover, we note that the instruction that was given, apparently drawn from the early case of *Bunn v. Prather* (1859), 21 Ill. 217, 218-19, is fundamentally deficient in a manner prejudicial to Harmswood. As stated it constitutes a complete negation of the defense; no exception is made for impossibility caused by situations not reasonably foreseeable by the parties. Plaintiff can hardly complain of an instruction which in itself could only have operated to her benefit.

### III

Finally Semrow contends that the trial court erred in denying her motion for judgment on the pleadings with respect to Harmswood's declaratory judgment action. She asserts that as the result of the continuation to trial of this action Harmswood was permitted to present evidence that would not have been permitted had only her action remained.

■■ We do not reach the isssue of whether Harmswood's amended complaint stated a cause of action because we find no prejudice resulted in any event, so that any error was not reversible. (*Harris Trust & Savings Bank v. Ali* (1981), 100 Ill. App. 3d 1, 425 N.E.2d 1359; *Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 404 N.E.2d 823.) The evidence which Semrow contends was admitted to her prejudice concerned Harmswood's attempts to borrow money from the SBA, evidence of the building code restrictions on repair efforts, and evidence of the snow damage. Clearly, all these matters were also relevant to Harmswood's claim of impossibility of performance. Accordingly, no prejudice resulted from the admission of this evidence, and we find no basis for reversal on this ground.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.