JAMES ZIEGER, Plaintiff-Appellee, *v.* MANHATTAN COFFEE COMPANY *et al.*, Defendants-Appellants.

Fifth District No. 82—67

Opinion filed February 4, 1983.—Rehearing denied March 2, 1983.

520

Paul P. Waller, Jr., of O'Connell & Waller, of Belleville, for appellant Nestle Company, Inc.

Sidney W. Horwitz, of Dubinsky, Duggan & Horwitz, of St. Louis, Missouri, for appellant Manhattan Coffee Company.

Freeark, Harvey & Mendillo, P.C., of Belleville (James R. Mendillo, of counsel), for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiff, James Zieger, brought this action alleging that he was discharged in violation of the Federal Age Discrimination in Employment Act (29 U.S.C. sec. 621 *et seq.* (1976)) (hereinafter the ADEA). Following trial, the jury found defendant Manhattan Coffee Company (Manhattan) guilty of age discrimination and fixed plaintiff's damages at $46,000. The jury also found defendant Nestle Company (Nestle),

of which Manhattan is a wholly owned subsidiary, liable to plaintiff as if it were plaintiff's employer. In answer to a special interrogatory, the jury found that Manhattan's violation of the ADEA was wilful. Based on that answer, the court entered judgment for plaintiff in the amount of $92,000. Defendants have filed joint briefs in this appeal. Further, this court ordered plaintiff's motion for attorney fees taken with the case. We affirm the judgment of the trial court and remand for determination of plaintiff's attorney fees in defense of this appeal.

Plaintiff's ultimate complaint alleged as follows: He was a "commissioned route salesman" employed by Manhattan from 1961 until he was fired on October 23, 1978, at age 62 as a result of Manhattan's "deliberate and wilful" conduct. It was further alleged that Manhattan was Nestle's wholly owned subsidiary and that Nestle so controlled Manhattan that Manhattan was an "agent or instrumentality" of Nestle and, therefore, that Nestle was also plaintiff's employer for purposes of the ADEA.

Nestle's answer to plaintiff's ultimate complaint purported to raise four affirmative defenses, two of which are pertinent to this appeal: (1) that Nestle was not plaintiff's employer, and (2) that plaintiff was discharged for good cause.

Testimony for plaintiff at trial was as follows:
William Taylor (examined pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60))

For six to seven years prior to and including plaintiff's discharge, Taylor was Manhattan's vice-president, Manhattan having no president. Some of the products sold by Manhattan salesmen were Nestle's and Nestle representatives were frequent visitors at Manhattan's St. Louis office. These visitors included product marketing personnel, an employment discrimination compliance officer, and attorneys representing Nestle.

Regarding plaintiff's discharge, Taylor was unaware of plaintiff's sales record, and it was not a factor in the discharge. Plaintiff's personnel file contained no complaints, warnings or reprimands. Taylor, just prior to his October 1978 vacation, discovered that the Stadium Club had made no purchases in the last six to seven weeks. Taylor told Tom Kinkle, plaintiff's supervisor, and Lou Wolff, sales manager, to discuss the problem with plaintiff and, if no progress was made, to tell plaintiff to take early retirement or resign. After Taylor's vacation, he met with plaintiff and Kinkle. Taylor asked plaintiff, "What is wrong, Bert? Do you think maybe you ought to get out of the rat race? Is something troubling you?" or words to that effect. Taylor also

referred to plaintiff's pension having already vested and suggested to plaintiff that the job was getting too tough for him. Plaintiff responded that he wanted to work to age 70, that he would not resign, and that Taylor would have to fire him. "Disturbed" by plaintiff's "insolent manner," Taylor fired him.

## Plaintiff

Plaintiff was age 65 at the time of trial. His immediate supervisor had been Lester Curran until 1977; thereafter, it was Kinkle. Plaintiff's route consisted of 150 to 200 accounts which he visited with varying frequency, some as often as twice weekly. He had never been warned or reprimanded. He characterized his relationship with his customers as good. He admitted some problems with customers, including Barbara at Long Ceil's, who accused him of making passes at her; Mr. Lewis at the Convention Center, who complained that plaintiff was slow; and Mr. Pietsch at Tony's, an account plaintiff had obtained by transfer from another salesman whom Mr. Pietsch also had not gotten along with.

During Taylor's October 1978 vacation, Wolff and Kinkle told plaintiff to retire. When plaintiff asked why, they told him there had been complaints but would not specify what the complaints were. When Taylor returned, Kinkle told plaintiff Taylor did not want to meet with him. Plaintiff insisted. When plaintiff told Taylor he would not retire or resign but intended to work to age 65, he was fired.

Regarding the Stadium Club, plaintiff told Wolff and Kinkle that he had not been there in two weeks. However, he was not sure it was two weeks, because when they asked him, he did not have his route book with him. Later he was told that it had been six weeks.

## Michael Schwartz

He replaced plaintiff after plaintiff was fired. The Stadium Club was on Schwartz' route for a time, but later Manhattan lost that account. More recently, the Stadium Club had bought some items from him but not coffee.

Testimony for defendants at trial was as follows:
## Hans Pietsch

Pietsch managed Tony's from 1963 to 1976. He had no problem with Manhattan until plaintiff took over the account. Plaintiff was supposed to make sure Tony's did not run out of coffee and filters. Instead, Pietsch had to call Taylor at home on several occasions to get needed supplies.

## Ernest Lewis

Lewis was chef at both the Stadium Club and the Convention Center. Plaintiff was supposed to make sure Lewis had sufficient supplies at both locations. Instead, Lewis often was required to call for service, and even then he would not get what he wanted on time. Lewis also noted plaintiff's belligerent attitude. Lewis called Wolff and Taylor on one occasion and told them he needed better service or a new coffee company.

## Lester Curran

Curran was plaintiff's supervisor from 1966 to 1977. When both Curran and plaintiff worked for Star Coffee Company, prior to Manhattan's 1966 acquisition of Star, Curran had been required to give two restaurant accounts to another salesperson due to complaints about plaintiff. Curran could not state any other specific complaints about plaintiff but believed the complaints he did receive concerned plaintiff's service and his poor disposition. When Curran discussed complaints with plaintiff, plaintiff promised to improve. Curran was of the opinion that minor complaints, especially about running out of stock, were common in his business; however, complaints about plaintiff concerned plaintiff's coming in with a "long face" and complaining to customers. Curran confirmed that the Stadium Club had not made a purchase in the six weeks prior to plaintiff's discharge.

## Thomas Kinkle

Kinkle's testimony regarding complaints about plaintiff from Long Ceil's and the Stadium Club was reiterative of Taylor's and plaintiff's. Plaintiff had also lost the Mayfair Hotel account because of inadequate service. Kinkle's testimony regarding the confrontation at which plaintiff was discharged agreed with Taylor's.

At the time of trial, Kinkle had salesmen ages 45, 58, and 61. Kinkle had ridden with plaintiff on his route about 10 to 15 times and had observed no problems.

## Louis Wolff

Wolff, general sales manager at Manhattan beginning in 1971, related three specific complaints he received regarding plaintiff: (1) the Mayfair Hotel, his account agreeing with Kinkle's; (2) the Stadium Club, the details reiterated being the same as Taylor's and Kinkle's; and (3) the Media Club, whose chef, unhappy with poor service and plaintiff's belligerence, had threatened to quit Manhattan. Most complaints about salesmen related to running out of stock; complaints

about any salesman's attitude were rare.

Plaintiff's sales when fired were "average." The ages of the last four salesmen hired were 28, 25, 30, and 24.

### William Taylor

Taylor mentioned complaints about plaintiff received from the Stadium Club, the Media Club, and the Convention Center. Complaining customers had mentioned plaintiff's attitude and behavior. When Taylor discussed complaints with plaintiff, plaintiff was pleasant and would promise to improve. Taylor discovered the loss of the Stadium Club account when he dined there and was served a competitor's coffee. Taylor admitted that of all of plaintiff's accounts (about 150, according to Schwartz), he could recall only six specific complaints over the years.

Manhattan's job application form did not inquire as to the applicant's age. As of October 23, 1978, 14 of Manhattan's 27 drivers were at least age 40.

The following witness testified for plaintiff in rebuttal:

### Chet Breitweiser

Breitweiser was a Manhattan sales trainee from June 1 to December 1, 1977, when he resigned. He rode with plaintiff at least 10 to 15 times and never saw plaintiff give any customer cause to complain.

### The Issues on Appeal

(1) Whether the trial court should have permitted defendants to be represented by separate counsel at trial; (2) Whether various evidentiary rulings were correct; (3) Whether either defendant was entitled to a directed verdict; (4) Whether various jury instruction rulings were correct; (5) Whether the court should have ordered a mistrial due to an "outburst" by plaintiff's wife; and (6) Whether plaintiff is entitled to attorney fees for defense of this appeal.

### I. Representation by Separate Counsel

On October 19, 1981, the first day of trial, plaintiff's attorney informed the court that attorney Paul Waller had just stated that Waller would represent Nestle at trial and attorney Sidney Horwitz would defend Manhattan. The trial court ruled that this was an impermissibly tardy attempt, one hour prior to going before the jury, to segregate what had theretofore been a joint defense effort. The court also observed that no issues of fact appeared which differentiated the parties to the extent that separate representation was required. Defend-

ants now contend that they had the right to representation of their choosing. Defendants urge that joint representation before the jury may have prejudiced them on the issue of fact whether Nestle so controlled Manhattan that Manhattan was the mere agent or instrumentality of Nestle. Plaintiff responds that the trial court properly exercised its discretion in view of the lateness of defendants' manifestation of their intentions and the similarity of defendants' positions on the factual issues.

■ At the outset, we note that the right of a party to representation by counsel of his own choosing, while a valuable right, is not absolute. Its exercise may be denied where it will unduly prejudice the other party or interfere with the administration of justice. Moreover, in matters relating to substitution of counsel, the manner in which the trial shall proceed is in the first instance for the discretion of the trial court, and this court will not interfere unless the record demonstrates that the complaining party was prejudiced. (*People v. Franklin* (1953), 415 Ill. 514, 517, 114 N.E.2d 661, 663.) We conclude that defendants have failed to demonstrate prejudice in this case. While defendants urge that their examination of Taylor after plaintiff's section 60 examination of that witness was somehow curtailed, defendants do not specify what questions Nestle could have asked about the relationship between defendants that could not have been posed with equal efficacy during defendants' case in chief. This is not a case in which the witness' attitude necessarily precluded Nestle from conducting a later examination with equal effect. (See *Cascio v. Bishop Sewer & Water Co.* (1954), 2 Ill. App. 2d 378, 384-85, 119 N.E.2d 531, 535.) Defendants also suggest that being forced to proceed under joint representation at trial prejudiced Nestle before the jury on the issue of fact whether Manhattan was Nestle's "agent or instrumentality." That issue of fact, like all others in the case, was to have been determined from the evidence adduced. The jury was property cautioned in this regard via Illinois Pattern Jury Instructions, Civil, Nos. 1.01 and 1.02 (2d ed. 1971) (hereinafter cited as IPI Civil). We will not presume from the mere fact that the verdicts were adverse to defendants that the jury disregarded its instructions.

Additionally, we agree with the trial court that defendants should have expressed their intention to defend at trial by separate counsel well before the day trial began. As recently as 11 days prior to trial, attorney Horwitz had filed matters on behalf of both defendants. Defendants' decision to proceed separately at trial would have substantial effect on arguments to the jury and the examination of witnesses. In our view, the trial court did not err in concluding that

plaintiff was entitled to more than an hour's notice of so radical a change in the structure of the trial.

Also, we note that of the two attorneys available to defend defendants on the first day of trial, only one, Waller, was licensed to practice law in Illinois. As attorney Horwitz conceded below, he could not enter an appearance below without local counsel. Since only Waller was available on the day in question, two choices were possible. The first, a continuance while Horwitz secured local counsel, was impractical and unwarranted with the jury already seated. The second, having Waller continue as Horwitz' local counsel, was equally impractical. If such was done openly, the appearance of separate counsel sought by defendants would not have been obtained. As for doing so secretly, we do not believe the trial court should have been forced to participate in such a subterfuge before the jury.

■ Additionally, we find somewhat misleading defendants' characterization of the issue as involving denial of counsel of their choice. It has been said that if a party has the means to employ counsel, he has the right to be represented by a lawyer of his own choosing; further, he has the right to employ as many lawyers to represent him as he sees fit. (*Magerstadt v. LaForge* (Mo. 1957), 303 S.W.2d 130, 133.) We know of no rule requiring the trial court to permit every attorney hired by a party to argue before the jury and to examine the witnesses. Here, both Waller and Horwitz were apparently present throughout the trial. Both made objections and motions. However, they were not both permitted to argue before the jury or to conduct examinations of witnesses.

In conclusion, we find no reason to fault the trial court's handling of this unusual circumstance. Moreover, we conclude that if the trial court erred in the ruling complained of, defendants have failed to demonstrate the prejudice required for reversal.

## II. Admission and Rejection of Evidence

■ Defendants argue that the court erred in permitting plaintiff to elicit testimony to the effect that Nestle was a subsidiary of Nestle Enterprises, in turn a subsidiary of Nestle, S.A., a Swiss organization. Defendants urge that this testimony was irrelevant and that it prejudiced Nestle by depicting Nestle as a large corporation, *i.e.*, a "deep pocket." However, the questions and answers complained of stand alone. Plaintiff did not elicit any evidence as to Nestle's income or assets or otherwise inquire as to its financial condition. Without more, we do not view the single inquiry complained of as likely to have engendered sympathy for plaintiff. We find any error in permit-

ting this limited inquiry harmless.

Defendants also contend that the trial court erred in refusing to let defendants read to the jury a memo written by Wolff setting forth the reasons for plaintiff's discharge and in refusing to let that memo go to the jury room. The court reasoned that the memo was undated and that there was some dispute as to when and how it was prepared. The court also noted that the matters referred to in the memo were merely repetitive of testimony by defendants' witnesses. Wolff testified that he "normally" wrote something when someone left Manhattan, to set forth the reasons for the departure. According to Wolff, defendants' attorney Horwitz asked him for a report on the matter subsequent to the time he had prepared the memo, after which Wolff gave Taylor the memo he had prepared. Plaintiff's attorney read at trial from the transcript of Wolff's deposition:

> " 'Mr. Horwitz: *** I asked Bill [Taylor] to get that so I knew what the thing was about. *** That was prepared for me. *** It was prepared by him to give to Bill Taylor to give to me so I knew what the cause was for the guy's termination.
>
> Mr. Mendillo: So we are clear on that, Mr. Horwitz, Plaintiff's Exhibit 1 was prepared for you. Is that right?:
>
> Mr. Horwitz: That's right.' "

Counsel for plaintiff also read from the transcript the following statement by attorney Horwitz regarding the memo: "Well, actually it's work product because I wanted to know what the hell was going on. If you want to put it in a form that I probably instituted it so that I would know what this was all about."

Wolff also testified at trial: "I don't remember the exact day I prepared it. I assume I prepared it right after [plaintiff] and Tom and I had the confrontation in his office. When Mr. Horwitz wanted it prepared, I already had it prepared."

■■ ■ Under Supreme Court Rule 236(a), any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, is admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was in the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record go to its weight, not its admissibility. (87 Ill. 2d R. 236(a).) Here, the trial court was not satisfied that it was in the regular course of business to make such a memo or that the memo was made in the regular course of business rather than in contempla-

tion of litigation. Defendants attempted no showing that a termination memo had been made in any other termination situation. Moreover, as the trial court implied Mr. Wolff's inability to date the memo suggested that it may not have been prepared at the time of the termination, which was known to Wolff, or reasonably soon thereafter. Under these facts, we conclude that the trial court did not abuse its discretion in refusing the memo. Additionally, we note, as did the trial court, that all of the matters stated in the memo were related in testimony by defendants' witnesses. Thus, the memo was merely repetitive of testimony, and any possibility of prejudice resulting to defendants due to the memo's exclusion was slight. We conclude that any error in this regard could not have affected the fairness of the trial.

### III. Motions for Directed Verdict

■ First, defendants contend that Nestle was entitled to a directed verdict on the issue of whether Manhattan was the "agent or instrumentality" of Nestle. In this regard, verdicts ought to be directed only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Nestle's liability under the ADEA, if any, is pursuant to the following sections. Section 623 makes it unlawful for an "employer" to discharge any individual because of age. (29 U.S.C. sec. 623 (1976).) Section 630(b) defines "employer," insofar as is pertinent here, as a "person" engaged in an industry affecting commerce who has 20 or more employees; the term also includes "any agent of such a person." (29 U.S.C. sec. 630(b) (1976).) Section 630(a) defines "person" as including "corporations." (29 U.S.C. sec. 630(a) (1976).) There is no question that Manhattan was plaintiff's "employer" for purposes of the ADEA. The question is whether the trial court erred in not concluding that Manhattan was not Nestle's "agent" as a matter of law under the ADEA.

■ To hold a parent corporation responsible for the acts of its subsidiary under the ADEA, the claimant must show that the nexus between the two is greater than a mere parent-subsidiary relationship. (*Sobelman v. Commerce Bancshares, Inc.* (E.D. Mo. 1977), 444 F. Supp. 84, 85; *Hassell v. Harmon Foods, Inc.* (6th Cir. 1972), 454 F.2d 199, 200.) It is appropriate to look to other types of discrimination cases in interpreting the Act's definition of "employer." (See, *e.g.,* *Odriozola v. Superior Cosmetic Distributors, Inc.* (D. P.R. 1982), 531

F. Supp. 1070, 1074.) In *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.* (1965), 380 U.S. 255, 256, 13 L. Ed. 2d 789, 790, 85 S. Ct. 876, 877, the Supreme Court adopted the National Labor Relations Board's four-factor test regarding whether nominally separate business entities should be regarded as a single employer to determine whether the "employer" in question was of sufficient size to fall within the Board's jurisdiction. Those criteria were: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. These criteria have since been adopted in ADEA cases. (*Marshall v. Arlene Knitwear, Inc.* (E.D.N.Y. 1978), 454 F. Supp. 715, 719, *modified* (2d Cir. 1979), 608 F.2d 1369; *Linskey v. Heidelberg Eastern, Inc.* (E.D.N.Y. 1979), 470 F. Supp. 1181, 1184; *Odriozola v. Superior Cosmetic Distributors, Inc.* (D. P.R. 1982), 531 F. Supp. 1070, 1074.) We consider our facts in light of these criteria.

(1) Interrelation of operations: According to Mr. Taylor, Manhattan sells Nestle products.

(2) Common management: According to Taylor, Nestle representatives visited Manhattan concerning their common pension plan and employment discrimination guidelines compliance; Nestle administered Manhattan's pension and health and accident insurance programs. According to Taylor, Manhattan had no president for six to seven years before Taylor became president. Taylor testified that he reported to Nestle through Jack Durland, president of Cain Coffee and that at meetings of Manhattan's Board of Directors, Mr. Taylor, who was not on the Board, was represented by Durland. Further, one of the other three Board members was also a Cain Coffee employee, and the other two were Nestle employees. Of Manhattan's four officers, one was a Cain employee and one was a Nestle employee. Taylor testified that he was autonomous with respect to hiring and firing decisions and that he discussed plaintiff's discharge with Durland, who told him to use his discretion.

(3) Centralized control of labor relations: As noted above, Taylor testified that Nestle representatives visited Manhattan regarding employment discrimination compliance and the pension plan, and that Nestle administered Manhattan's pension and health and accident insurance programs.

(4) Common ownership or financial control: According to Taylor, Manhattan was a wholly owned subsidiary of Nestle and Manhattan was owned by Cain Coffee, which with Manhattan was purchased by Nestle in 1960.

We are of the opinion that the above evidence was not conclusive

one way or the other as to whether Manhattan was Nestle's "agent" for purposes of the ADEA. We find the issue to have been one of fact for the jury and that the trial court did not err in refusing to direct a verdict for Nestle on that basis.

Defendants urge, however, that a more appropriate "test" for determining whether Nestle and Manhattan should have been treated as a single employer under the ADEA is set forth in *C M Corp. v. Oberer Development Co.* (7th Cir. 1980), 631 F.2d 536, 538-39. However, as plaintiff correctly notes, this, and the other cases cited by defendants which apply this test, are "piercing the corporate veil" cases, not employment discrimination cases. In any event, the two tests are not so dissimilar that choosing between the two is significant in our review of the instant case.

▉▉ ▉ Next, defendants contend that they were entitled to directed verdicts because plaintiff neither established a *prima facie* case of age discrimination nor rebutted the legitimate nondiscriminatory reasons for his discharge articulated by defendants. The elements of a *prima facie* case under the ADEA are: (1) Plaintiff was in the protected age group; (2) his job performance met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) after he left, his employer sought someone outside the protected age group to perform the same work. (*Loeb v. Textron, Inc.* (1st Cir. 1979), 600 F.2d 1003, 1014.) If the plaintiff satisfies this burden, the burden shifts to his employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. (*Cova v. Coca-Cola Bottling Co. of St. Louis, Inc.* (8th Cir. 1978), 574 F.2d 958, 959.) If the employer articulates such a reason, the inference of discrimination created by the *prima facie* case is dispelled, until and unless the employer's articulated reason is shown to be a pretext. (*Loeb v. Textron, Inc.*) Plaintiff is not required to show that age discrimination was the sole cause of his discharge. Where the employer acts out of mixed motives, the plaintiff must show that age was a "causative or determinative factor," *i.e.*, "one that made a difference in deciding whether the plaintiff should be employed." (*Geller v. Markham* (2d Cir. 1980), 635 F.2d 1027, 1035, *cert. denied* (1981), 451 U.S. 945, 68 L. Ed. 2d 332, 101 S. Ct. 2028.) The Act should not affect an employer's decisions based on individual assessments of an employee's abilities or potential. *Magruder v. Selling Areas Marketing, Inc.* (N.D. Ill. 1977), 439 F. Supp. 1155, 1164.

Defendants do not state what they consider to be the specific shortcomings of plaintiff's *prima facie* case. Since the facts that plaintiff was in the protected age group, was fired, and was replaced

by someone outside the protected age group seem well established, it appears that defendants are implying that plaintiff did not show that his job performance met his employer's legitimate expectations. That plaintiff did not meet those expectations was the crux of defendants' attempt to articulate a legitimate nondiscriminatory reason for plaintiff's discharge. Defendants contend that plaintiff did not rebut their showing that plaintiff neglected his customers and was hostile and belligerent toward them.

Defendants did elicit considerable testimony as to incidents of specific complaints regarding plaintiff's job performance. Defendants urge that against this backdrop, Manhattan management properly regarded plaintiff's failure to report the loss of the Stadium Club account and his untruthfulness regarding how long the account had been lost as fully justifying his discharge. Plaintiff emphasizes that defendants' witnesses could specify only six complaints against him during all the years he worked for Manhattan and that those witnesses conceded that complaints were common in Manhattan's business and that plaintiff's personnel file contained neither written complaints nor reprimands. Plaintiff also notes the following: both Kinkle and Breitweiser testified that they rode with plaintiff on his route on numerous occasions without observing any problems; Taylor characterized plaintiff's sales as average; and while Schwartz testified that the Stadium Club account was on his route after plaintiff resigned and was later lost again, no evidence appears that Schwartz was disciplined over his loss of that account.

Our view of this evidence is that more than one conclusion could have been drawn from it. The jury might have concluded that plaintiff was fired for poor job performance. The jury could also have concluded that plaintiff's age was at least a determining factor in his discharge and that a younger person with a similar performance record would not have been discharged. Resolution of conflicting evidence is the province of the finder of fact, in this case the jury. (*Cummings. v. Chicago Transit Authority* (1980), 86 Ill. App. 3d 914, 921, 408 N.E.2d 737, 742.) We conclude that the trial court properly refused to direct a verdict for either defendant on this basis.

## IV. Jury Instructions

Defendants assign numerous errors in the giving and refusal of jury instructions. Some general observations are appropriate in advance of discussion of their specific contentions. First, there are no Illinois Pattern Jury Instructions (hereinafter IPI) on the subject of age discrimination cases or the ADEA. Under Illinois procedure, non-

IPI instructions, when given, should be "brief, impartial, and free from argument." (87 Ill. 2d R. 239(a).) Second, what must be decided is whether the instructions given, as a whole, fairly and fully stated the law applicable to the case. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 314, 170 N.E.2d 163, 170.) That the jury might have been instructed in an alternative manner which would have been equally acceptable does not require reversal. See *Kelly v. American Standard, Inc.* (9th Cir. 1981), 640 F.2d 974, 985 n.18.

Defendants contend that the trial court erred in giving plaintiff's issues instruction (plaintiff's No. 10) instead of defendants' (defendants' No. 10). Defendants contend that the jury should have received an issues instruction setting forth their affirmative defenses: (1) whether Nestle was plaintiff's employer; (2) whether plaintiff duly notified the Secretary of Labor of his intention to sue Nestle; and (3) whether plaintiff was discharged because of neglect of customers' needs and his generally poor attitude, *i.e.*, for good cause.

■ We agree with plaintiff that defendants' No. 10 was properly refused. It is unduly lengthy. It is also needlessly argumentative. For example, it states that defendants claim that plaintiff was discharged because he "repeatedly neglected the needs of his customers after being warned on numerous occasions ***." Such rhetoric was better reserved for closing argument to the jury.

■ Additionally, we are of the opinion that defendants' "affirmative defenses" were not true affirmative defenses. A defense is of an affirmative nature if, by the raising of it, a defendant gives color to his opponent's claim and then asserts new matter by which the apparent right is defeated. (*Horst v. Morand Brothers Beverage Co.* (1968), 96 Ill. App. 2d 68, 80, 237 N.E.2d 732, 738.) The instant "affirmative defenses" were merely specific reasons to support defendants' denials of liability. These "affirmative defenses" neither admitted any part of plaintiff's case nor introduced any new matter which would have defeated plaintiff's contentions.

Next, defendants contend that the court erred in giving plaintiff's instructions Nos. 9 and 13. No. 9 instructed the jury that if it found for plaintiff on the question of liability, it must fix the amount of money which would reasonably compensate plaintiff for, *inter alia*, earnings reasonably certain to be lost in the future. No. 13 included a similar reference to loss of future earnings. Plaintiff was 65 years old as of trial. Defendants urge that since plaintiff had reached the maximum age protected under the ADEA as of trial, the references to future earnings contained in these instructions were error. Plaintiff replies that the amendment to the ADEA raising the protected age to

70 was in effect as of trial.

Plaintiff also argues that defendants waived this issue by failing to argue on trial "that future damages were not recoverable under the Act ***." Defendants argued in the trial court that the 1978 ADEA amendments were not retroactive. Defendants' present contention was implicit in their contention below.

Therefore, we are required to determine the effective date of the amendment raising the maximum age protected by the ADEA to age 70. The amending act provided in pertinent part that the amendments therein were effective as of the date of enactment of the amending act, April 6, 1978. (Pub. L. No. 95—256, sec. 2(b), 92 Stat. 189.) However, while the amending act was effective that date, the amending act expressly stated that the amendment to the section in question, 29 U.S.C. sec. 631(a) (1976), would take effect on January 1, 1979. (Pub. L. No. 95—256, sec. 3(b), 92 Stat. 190.) The latter date is the effective date of the change of the maximum protected age. *Jensen v. Gulf Oil Refining & Marketing Co.* (5th Cir. 1980), 623 F.2d 406, cited by plaintiff, concerned 29 U.S.C. sec. 623(f)(2) (1976), the amendments to which were indeed effective on the date of enactment of the 1978 amendments. (Pub. L. No. 95—256, sec. 2(b), 92 Stat. 189.) *Tribble v. Westinghouse Electric Corp.* (E.D. Mo. 1980), 508 F. Supp. 14, *aff'd* (8th Cir. 1982), 669 F.2d 1193, cited by plaintiff, states that the 1978 ADEA amendments were effective April 6, 1978. We agree. Since *Tribble* was terminated prior to April 6, 1978, the effective date of the amendment to the maximum protected age was not at issue in that case.

■ Since plaintiff had attained the maximum protected age under the ADEA as of trial, the court erred in instructing the jury regarding future lost earnings. (*Cf. Tribble v. Westinghouse Electric Corp.*, where the court observed that the recovery period for lost wages may not be extended beyond age 65 under the pre-1978 ADEA.) Plaintiff alternatively argues that such error was harmless. Plaintiff contends that the jury verdict of $46,000 damages indicates that the jury concluded that plaintiff would not have worked beyond age 65 in any event. Plaintiff's brief states: "$46,000 is approximately three years of wages plus decreased pension benefits." As of plaintiff's discharge, he was 63 years old. Testimony at trial indicated that in recent years his earnings had varied from about $12,000 to about $17,000. While Taylor testified at trial that plaintiff had told him he wanted to work to age 70, plaintiff testified that he had stated age 65.

We agree with the plaintiff that the jury evidently believed that

plaintiff did not intend to work beyond age 65, *i.e.*, that plaintiff would have voluntarily retired prior to the time of trial and would not have been entitled to recover earnings lost in the future. If the jury followed its instructions, it should have awarded plaintiff either nothing or the full measure of his damages. The instant verdict falls far short of compensating plaintiff for earnings lost until age 70. As it appears that the jury's verdict was not influenced by the portions of plaintiff's instructions No. 9 and No. 13 which we have concluded are erroneous, we find such error harmless.

Next, defendants contend that the trial court erred in giving plaintiff's instructions Nos. 11, 12, and 14. Numbers 11 and 12 are plaintiff's burden-of-proof instructions as to Manhattan and Nestle, respectively. Both 11 and 12 state in pertinent part that plaintiff is required to prove that his age was "a determinative factor" in his discharge. Number 14 defined "determinative factor" as "a factor which made a difference in" defendants' discharge of plaintiff.

■■■ That plaintiff should have prevailed if he proved that his age was "a determinative factor" in his discharge was an accurate statement of the law. (See *Tribble v. Westinghouse Electric Corp.* (8th Cir. 1982), 669 F.2d 1193, 1197.) As to the sufficiency of the instructions as a whole, it has been observed that jury instructions in an ADEA case should be sufficient to prevent the mistaken inferences that (1) age must be the sole factor in the plaintiff's discharge to entitle the plaintiff to recover, and (2) age may be less than a "but for" cause of the discharge yet still support recovery by the plaintiff. (*Cancellier v. Federated Department Stores* (9th Cir. 1982), 672 F.2d 1312, 1316.) the instant facts having presented a close mixed-motive question of fact, it was essential that the jury instructions on this subject be fair and accurate. Unfortunately, while many Federal cases discuss what instructions on the subject are proper, our research has disclosed no definitive guidance. The following authorities provide some illumination by comparison with the instant facts:

In *Loeb v. Textron, Inc.* (1st Cir. 1979), 600 F.2d 1003, 1019, the evidence indicated that the plaintiff's discharge might have been due to both legal and discriminatory motives. The circuit court stated that under those circumstances the court should have instructed the jury that for plaintiff to prevail he had to prove that his age was the "determining factor" in his discharge in the sense that, "but for" his employer's motive to discriminate against him because of his age, he would not have been discharged.

*Geller v. Markham* (2d Cir. 1980), 635 F.2d 1027, *cert. denied* (1981), 451 U.S. 945, 68 L. Ed. 2d 332, 101 S. Ct. 2028, was also a

"mixed-motive" fact situation. The district court instructed the jury, in pertinent part:

> " 'There could have been more than one reason for defendants' decision about [Mrs. Geller's] employment but she is nevertheless entitled to recover if one factor was her [age] and if it made a difference in determining whether she would be employed. If it did not make any difference, if it was not a reason that entered into the decision, then of course she has not proved her case. But if it did, then she has.
>
> If defendants' decision about Mrs. Geller was made in whole or in part because she was above the fifth step on the salary scale, \*\*\* Mrs. Geller is entitled to recover \*\*\*.' " (635 F.2d 1027, 1031.)

In addition to the foregoing instruction, the following special interrogatory was submitted to the jury in *Geller*:

> "[Was] the 'sixth step' guideline \*\*\* 'one reason' for Mrs. Geller's not being hired for the permanent art teacher's position." (635 F.2d 1027, 1035.)

Relying in part on *Loeb*, the *Geller* court concluded that instructions, including the interrogatory, taken together, were adequate. The instructions approved in *Geller* were more lengthy than the instant instructions on the subject; however, that is due in large part to repetition of the crucial issue. We do not view the *Geller* instructions as providing the jury with more genuine guidance than the instant instructions.

In *Bentley v. Stromberg-Carlson Corp.* (2d Cir. 1981), 638 F.2d 9, another mixed-motive case, the plaintiff-appellant timely requested a charge that if the jury found that one of the factors affecting the plaintiff's discharge was his age and that it made a difference in determining whether he was to be retained or discharged, then they might find for the plaintiff even though the need to reduce the work force generally was also a strong, and perhaps even a more compelling reason. Instead, the court gave the charge: "Was age a determining factor in Stromberg-Carlson's layoff of the plaintiff \*\*\*?" (638 F.2d 9, 11.) There was no accompanying explanation of the term "determining factor." The circuit court concluded that the district court erred in refusing the plaintiff's tendered instruction. The instant charge, with its definition of "determinative factor," provided significantly more guidance than the instruction held insufficient in *Bentley*. While the instruction noted as preferable in *Bentley*, unlike the instant instructions, also incorporated the defendants' theory of the case to some extent, we do not regard the instruction preferred in

*Bentley* as more favorable to defendants than the instant instructions. In fact, the *Bentley* instruction referred to the defendants' theory of the case in such a manner as to invite the jury to disregard it.

We conclude that comparison of plaintiff's Nos. 9, 13, and 14 with *Loeb, Geller,* and *Bentley* indicates that the instant instructions were fair and sufficient. We do not consider them exemplary. However, they were at least sufficient to fairly present the crucial issue of fact to the jury. We find no error in this regard.

Next, defendants assign error in the giving of plaintiff's instructions Nos. 15 and 16. The former is a special interrogatory as to whether defendants' conduct was "willful." The latter defines "willfully" as "done voluntarily, knowingly and intentionally, as distinguished from conduct that is accidental or unknowing." The jury was instructed to answer the special interrogatory only if the jury had reached a verdict against one or both defendants. Defendants contend there was no evidence to support giving wilfulness instructions. We do not agree.

Defendants rely principally on *Syvock v. Milwaukee Boiler Manufacturing Co.* (7th Cir. 1981), 665 F.2d 149, 155-56, wherein the court stated that in order to prove wilfulness under 29 U.S.C. sec. 626(b) (1976), a plaintiff must show that the defendant's actions were knowing or voluntary and that the defendant knew or reasonably should have known that those actions violated the ADEA, *i.e.,* that the defendant knew or reasonably should have known (1) what the ADEA requires, and (2) that his actions toward the plaintiff were inconsistent with those requirements. Parenthetically, *Syvock* was decided subsequent to the instant trial. By its own terms, the *Syvock* standard does not require actual knowledge of the ADEA or that a violation thereof has occurred, is occurring, or is about to occur as requisite to a finding of wilfulness. Here there was testimony that the discharge decision was made by Manhattan's chief operating officer and that Manhattan was in contact with an employment discrimination compliance officer from Nestle. In our view this evidence supported the giving of wilfulness instructions. Moreover, while it has been said that a finding of pretext does not necessarily compel a finding of wilful discrimination (*Syvock v. Milwaukee Boiler Manufacturing Co.* (7th Cir. 1981), 665 F.2d 149, 157), it appears that facts supportive of a finding of pretext may also support a finding of wilfulness.

In a related contention, defendants argue that the trial court erred in giving wilfulness instructions while failing to include wilfulness in a burden of proof instruction. Defendants did not object to the

wilfulness instructions on that basis at trial. Objections to instructions on grounds not asserted at the instruction conference at trial are not well taken. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 314, 170 N.E.2d 163, 170.) Also, defendants' tendered burden of proof instruction, discussed *supra*, did not incorporate the wilfulness issue. In general, a party may not complain that an instruction not tendered was not given. (*Buttitta v. Lawrence* (1931), 346 Ill. 164, 172, 178 N.E. 390, 393.) We find the issue to be waived. Further, the issue is without merit. There was no question before the jury as to amount of liquidated damages. The jury was to determine only whether liquidated damages were appropriate. More importantly, plaintiff did not have to prove wilfulness to avoid a finding of no liability on defendants' part. Since this was not true of the other issues referred to in the burden of proof instructions, adding the wilfulness issue to the burden of proof instructions while properly reflecting that dichotomy would have greatly increased the complexity of the burden of proof instructions. We consider the instant special interrogatory format less confusing than the alternative defendants now suggest. We also note that the special interrogatory format for the wilfulness issue was used in *Geller v. Markham* (2d Cir. 1980), 635 F.2d 1027, 1031, although the propriety of doing so was not in issue there.

Defendants also argue that the definition of wilfulness in plaintiff's No. 16 was erroneous. The ADEA does not define wilfulness. Defendants argue that a virtually identical instruction was held erroneous in *Syvock v. Milwaukee Boiler Manufacturing Co.* (7th Cir. 1981), 665 F.2d 149, 156. The *Syvock* court approved the comments of the court in *Wehr v. Burroughs Corp.* (3d Cir. 1980), 619 F.2d 276, 283, regarding the definition of wilfulness included in the jury charge in *Wehr*. (665 F.2d 149, 155 n.9, 156.) The *Wehr* circuit court upheld a finding of wilfulness on a charge defining "willful" as action that was deliberate, intentional, and knowing. However, the *Wehr* court concluded that that definition placed a higher burden on the plaintiff than the ADEA required; wilfulness under the ADEA could also be found if the plaintiff proved that the discharge was precipitated in reckless disregard of the consequences.

■■ The instant definition of wilfulness was nearly identical to the definition referred to in *Wehr* and *Syvock* as imposing an overly strict burden on the plaintiff. Defendants cannot complain of an instructional error which could only have operated to their benefit. (*Semrow v. Harmswood Stables North, Inc.* (1981), 100 Ill. App. 3d 219, 227, 426 N.E.2d 988, 993.) Any error in this regard was not cause for reversal.

Defendants also contend that the instant instruction defining wilfulness was deficient because it did not "require that Manhattan knew or reasonably should have known that its discharge of plaintiff violated the ADEA." Defendants waived the issue by failing to tender an instruction to that effect or object on that basis at the instruction conference. The trial court had no opportunity to rule on this contention and also was without benefit of *Syvock,* defendants' sole authority on this point, a case decided subsequent to the instant trial.

Next, defendants contend that the trial court erred in refusing defendants' instruction No. 2, which stated:

"Although you may find that the Manhattan Coffee Company is a wholly-owned subsidiary corporation of the Defendant, Nestle Company, Inc., and although you may find that the Plaintiff is covered by the pension program of the Nestle Company, Inc., you shall not render a verdict against the Nestle Company, Inc., unless you also find that the Manhattan Coffee Company Corporation is a sham or a mere instrumentality of the Nestle Company, Inc., and not recognizable as a separate corporate entity and that the Plaintiff was in fact an employee of the Nestle Company, Inc."

This instruction was properly refused. It is unduly argumentative. It seizes upon three different ways of stating plaintiff's burden of proof on the "agent or instrumentality" issue and states them in sequence as if each is a different matter plaintiff must prove in order to prevail. Also, this instruction directed a verdict for defendant Nestle; plaintiff was not "in fact an employee" of Nestle, a fact which plaintiff was not required to prove in order to prevail.

Next, defendants contend that the trial court erred in refusing defendants' instruction No. 9, which stated:

"If you find the issues in favor of the Defendants, then you will have no cause to consider the question of damages. If you find the issues in favor of the Plaintiff, then it will be your duty to consider the question of damages the Plaintiff may be entitled to recover.

The amount of your verdict should be a sum that you find will justly compensate the Plaintiff for the damages he has incurred. The measure of damages to which he is entitled, if any, is the amount which he would have earned from his employment with the employer to age 65 (September 8, 1981) had he not been discharged, reduced by any earnings which Plaintiff had, or could have reasonably had, from other employment. In other words, the Plaintiff has the duty to mitigate or minimize

his damage and the Defendants are not responsible for lost earnings to the extent that such loss could have been avoided had the Plaintiff used reasonable care in seeking other employment to avoid or minimize the injury."

First, defendants argue that this instruction would have informed the jury as to the proper period of time for which plaintiff might be found to have lost earnings, *i.e.*, until age 65, not age 70. We previously have addressed this contention. Second, defendants argue that refusal of this instruction deprived the jury of proper guidance as to plaintiff's duty to mitigate damages. However, as plaintiff notes, the court gave a mitigation of damages instruction (almost verbatim IPI Civil No. 33.02) at defendants' behest. We perceive no justification for emphasizing plaintiff's duty to mitigate by its repetition to the jury. It was not reversible error to fail to do so. Also, we agree with plaintiff that defendants' instruction No. 9 did not share the virtues of the IPI mitigation instruction, the latter being the more brief, clear, and simple of the two.

## V. Motion for Mistrial

■■■ Defendants contend that the trial court erred in refusing to order a mistrial due to plaintiff's wife's "outburst" during plaintiff's cross-examination of Schwartz. Plaintiff had asked Schwartz several questions relating to where Schwartz parked his Manhattan company truck. When asked whether he parked anywhere other than places he had already mentioned, Schwartz replied in the negative. Mrs. Zieger interjected, "That is not true." Outside the presence of the jury, defendants moved for a mistrial and alternatively suggested polling the jury as to the effect of Mrs. Zieger's statement. The court refused both alternatives, stating that in its opinion the "outburst" would not have any effect on the trial and that the line of questioning being pursued at the time in question was without significance to the issues in the case. The question whether such an outburst merits mistrial rests within the sound discretion of the trial judge, whose determination will not be reversed on appeal absent apparent error. (*Costello v. Chicago Transit Authority* (1976), 40 Ill. App. 3d 461, 470, 352 N.E.2d 417, 424.) We agree with the trial court that the matter about which Schwartz was being examined at the time of Mrs. Zieger's comment was insignificant. No objective indicia of prejudice to defendants appear of record. On these facts, we cannot say that the trial court exceeded its discretion in refusing a mistrial. We also agree with the trial court that polling the jury would not necessarily have had any ameliorative effect and might have unduly emphasized what we per-

ceive to be a trivial incident.

Conclusion.

We conclude that none of defendants' assignments of error, alone or together, warrants reversal. The trial, if not perfect, was in our view sufficiently fair in its submission of the issues to the jury. The judgment of the circuit court of St. Clair County is, therefore, affirmed.

VI. Plaintiff's Motion for Attorney Fees on Appeal

●■ This court ordered plaintiff's motion for attorney fees incurred in defending this appeal to be taken with the case. An award of fees to compensate a prevailing plaintiff for services of counsel in connection with an appeal is within the discretion of the appellate court under the ADEA. (29 U.S.C. secs. 216(b), 626(b) (1976); *Cleverly v. Western Electric Co.* (8th Cir. 1979), 594 F.2d 638, 643.) Such an award is appropriate to reflect successful defense of the verdict below. (*Cancellier v. Federated Department Stores* (9th Cir. 1982), 672 F.2d 1312, 1320.) Plaintiff's motion is granted, and the cause is remanded to the circuit court for the purpose of determining the amount of such fees to be awarded to plaintiff.

The judgment of the circuit court of St. Clair County is affirmed, and the cause is remanded for determination of attorney fees on appeal.

Affirmed and remanded.

HARRISON, P.J., and WELCH, J., concur.