255 N.J. Super. 307 (1992)
605 A.2d 252
RICHARD J. D'AGOSTINO, PLAINTIFF-RESPONDENT,
v.
JOHNSON & JOHNSON, INC., ROBERT N. WILSON AND RONALD G. GELBMAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 1991.
Decided March 30, 1992.
*308 Before Judges MICHELS, O'BRIEN and CONLEY.
Alan E. Kraus argued the cause for appellants (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Nicholas deB. Katzenbach, of counsel; Alan E. Kraus and David P. Arciszewski, on the brief).
Douglas V. Rigler, a member of the District of Columbia Bar, argued the cause for respondent (Lasser, Hochman, Marcus, Guryan & Kuskin, attorneys; Kaplan, Russin & Vecchi, of the District of Columbia Bar and Douglas V. Rigler and Barry L. Eisenberg, of counsel; Douglas V. Rigler and Barry L. Eisenberg, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendants Johnson & Johnson, Inc. (J & J), Robert N. Wilson (Wilson), J & J's Vice Chairman, and Ronald G. Gelbman (Gelbman), a J & J Company Group Chairman, appeal pursuant to leave granted by this court from an order of the Law Division that denied their motions for summary judgment in this action by plaintiff Richard J. D'Agostino to recover damages for the alleged retaliatory termination of his employment by Cilag, A.P. (Cilag), a Swiss subsidiary of Johnson & Johnson, *309 Inc. Plaintiff claims that he was fired by Cilag for his refusal to approve payments to a Swiss pharmaceutical official and that defendants made defamatory statements about him and engaged in a conspiracy to prevent him from obtaining other employment in the pharmaceutical industry. Under Swiss law, there is no cause of action for retaliatory termination and plaintiff's claims would be barred by the Swiss one-year limitations period. The Law Division, however, applied New Jersey law and denied summary judgment, finding that plaintiff had alleged sufficient facts for his claim under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1982), to proceed to trial. The pivotal issue raised by this appeal, therefore, is whether Switzerland has a more significant governmental interest in the resolution of this matter so that Swiss law should have been applied by the trial court rather than the law of New Jersey. We are satisfied that Swiss law should have been applied and, therefore, reverse and enter summary judgment in favor of defendants.
The factual background giving rise to this appeal began in December 1984, when plaintiff, who was a citizen of the United States but a resident of Switzerland, was hired as General Manager of the Swiss Home Market Division of Cilag, a Switzerland corporation and a subsidiary of J & J. Plaintiff was hired by Dr. Hans Schmid (Dr. Schmid), Chairman of Cilag, and an announcement of plaintiff's employment was issued by Dr. Schmid on the letterhead of Johnson & Johnson International, which is located in New Brunswick, New Jersey. J & J explained that such an announcement was routinely issued from Switzerland on the Johnson & Johnson International stationery and widely distributed as a matter of course to many of the executives of J & J and its subsidiaries.
Plaintiff signed an employment contract with Cilag, dated December 21, 1984, which designated that Swiss law would govern disputes arising from the employment contract and that the City of Schaffhausen, Switzerland was the place of venue. The contract further provided for an at-will employment and *310 that either party could terminate the employment relationship on six-months notice. Plaintiff commenced working for Cilag at its Schaffhausen, Switzerland facility in April 1985. He acknowledged that he was on a six-month probationary period. As General Manager of Cilag, plaintiff performed his duties in Schaffhausen and reported to Dr. Schmid and Paul G. Reinstadtler (Reinstadtler), Managing Director of Cilag, Germany. According to J & J, plaintiff's duties involved the marketing and registration of pharmaceutical products in Switzerland and plaintiff had no duties outside Switzerland and had no position with J & J.
Plaintiff maintains that he received direct instruction from J & J officers located at corporate headquarters in New Jersey. Plaintiff received a letter dated June 4, 1985 from the Office of General Counsel of J & J regarding the J & J Policy Statement which prohibits use of corporate funds for unlawful purposes. According to plaintiff, this Policy Statement refers to the necessity of compliance with the Federal Foreign Corrupt Practices Act, 15 U.S.C.A. § 78dd-1, et seq. and is applicable to "J & J and all its domestic and foreign subsidiaries." With this Policy Statement, plaintiff received a letter from the Chairman of J & J announcing a "worldwide" policy binding on all J & J employees. Plaintiff indicates that when he received the letter from General Counsel, he promptly replied that he had not received a copy of the Policy Statement, but would execute said document upon receipt.
In June 1985, plaintiff was in New Brunswick, New Jersey, to attend a meeting of the managing directors of J & J's Cilag Companies. At this meeting, plaintiff alleges that he was asked by Wilson, who, in addition to being Vice Chairman of J & J, was also Executive Vice President of J & J International, about the status of Immunox, a synthetic hormone under development. When plaintiff said that Immunox had been rejected for the second time by Swiss authorities, plaintiff claims that Dr. Schmid and a Dr. H.U. Balthasar (Balthasar) "jumped up" and assured everyone at the meeting that the *311 Immunox situation was under control. According to plaintiff, both Dr. Schmid and Dr. Balthasar appeared to be very excited at this time. Plaintiff claims that his job performance was evaluated largely by his ability to gain approval of compounds such as Immunox, referring to a letter received from his supervisor, Reinstadtler, which stressed corporate objectives, including the "mandatory" goal of obtaining quick approval of new pharmaceutical compounds offered by J & J's "worldwide research centers."
Sometime in June 1985, plaintiff received a voucher authorizing payment of "consulting fees" to a Dr. Rudolph Preisig (Preisig). Dr. Preisig was the president of the "college of experts" of the International Office for the Control of Medicaments, which controls the registration of new drugs in Switzerland. Suspecting that the payment of such consulting fees was tantamount to a bribe, plaintiff did not sign the voucher and asked his secretary to organize a dossier regarding the payments to Dr. Preisig. Plaintiff admits that at this point, he did not ask his superiors, Dr. Schmid and Reinstadtler, or J & J's General Counsel, George Frazza (Frazza), about the payments to Dr. Preisig. Plaintiff, however, received an inquiry from Dr. Balthasar as to why Dr. Preisig had not received payment of his consulting fees.
Several days later, plaintiff received a dossier containing documents which stated the importance of Dr. Preisig due to his official position, and the importance of drug testing to J & J. This dossier contained no contract with Dr. Preisig. At this point, plaintiff went to Dr. G. Kretzschmar, the Cilag executive from whom the voucher in question originated, and was told that there was no contract with Dr. Preisig. Plaintiff did not ask Dr. Balthasar, Dr. Schmid, Frazza or Cilag's lawyer if such a contract existed. According to plaintiff, Dr. Kretzschmar told him,
you have to pay, you have to go along. He says, it has been going on for a long time. Be happy that it wasn't more.
*312 However, Dr. Kretzschmar did not indicate to plaintiff that the payments to Dr. Preisig were unlawful and plaintiff did not recall if he said anything about the payments being unlawful.
Plaintiff received a second payment voucher for payment to Dr. Preisig. Sometime after receipt of the voucher, plaintiff met with Reinstadtler and Dr. Kretzschmar. Dr. Kretzschmar asked plaintiff if he was going to sign the voucher for payment to Dr. Preisig, and plaintiff replied that he would not sign it until he had "a better explanation." Reinstadtler thereupon excused himself from the meeting because he had to meet with Dr. Schmid. According to plaintiff, he called Reinstadtler that night because they were supposed to have dinner together, and Reinstadtler canceled their dinner because he was still talking to Dr. Schmid. The next day plaintiff was notified that he was being terminated. Plaintiff says he was told by Reinstadtler: "I have been talking with Schmid and you have to go...." Plaintiff contends that his termination was based on his failure to approve the payments to Dr. Preisig.
After his termination, plaintiff claims that he telephoned Frazza, and told him that there were some "funny business" and "credo violations" going on at Cilag. According to Frazza, plaintiff never mentioned illegal payments to Dr. Preisig and he does not recall if plaintiff used the phrase "funny business" in their conversation. Plaintiff also indicates that he spoke with Frank Ziegler (Ziegler), who was located at the J & J Company in Sprittenbach, about credo violations. However, plaintiff did not specifically refer to the payments to Dr. Preisig in this conversation.
Subsequent to his termination, Cilag and plaintiff began negotiating a separation agreement. Eventually, an agreement was reached between the parties, and a settlement document was prepared. However, plaintiff refused to sign the document because it did not reflect all the terms he had discussed with Cilag. Moreover, plaintiff claims that the agreement was "coercive" and that he accepted its terms "under extreme duress." *313 Additionally, he claims that he did not receive any actual benefit from the purported separation agreement because the six-months severance pay he received was required by his employment contract, which contained a six-month notice requirement.
Plaintiff and Cilag agreed to treat plaintiff's termination as a resignation. On August 1, 1985, Dr. Schmid announced that resignation on Johnson & Johnson International letterhead which was distributed to the same people that received the announcement of plaintiff's hiring. The announcement read:
I regret to announce that Mr. Richard J. D'Agostino has decided to resign his position as General Manager, CILAG Switzerland Home Market, effective immediately.
I wish Mr. R.J. D'Agostino the best of everything in the pursuit of his new professional career.
On November 3, 1986, Cilag filed a complaint in the Friedensrichter [court of petty jurisdiction] Schaffhausen, seeking a declaratory judgment to establish that plaintiff had no claims against Cilag arising out of his employment with Cilag and the termination of the employment. Plaintiff notified the court that he would not respond to the complaint. The Kantonsgericht Schaffhausen [Cantonial Court of Switzerland] thereupon dismissed the action against Cilag, holding generally that Cilag lacked standing to pursue the declaratory judgment action in the absence of plaintiff. The Court concluded that:
It, therefore, is reasonable to require [Cilag] to wait until [Mr. D'Agostino] brings his claim. The action for a negative declaratory judgment will not be entertained.
On or about November 20, 1986, plaintiff filed a criminal complaint in Berne, Switzerland, accusing Cilag of bribing Dr. Preisig. As a consequence, the Swiss Public Prosecutor instituted a thorough investigation of Cilag's payments to Dr. Preisig. The examining magistrate found that Dr. Preisig had not demanded or accepted gifts or "improper advantages" from Cilag. The examining magistrate also found that the fees paid to Dr. Preisig were actually moderate compared to the work *314 performed and that Dr. Preisig had earned the consulting fees due him. The examining magistrate concluded:
The accusation that the payments concerned were intended as gifts, or as improper advantages offered to Professor Preisig, is therefore conclusively refuted  in retrospect, the accusation must have arisen from the fact that the accuser was totally unaware of the actual situation.
The examining magistrate's decision was approved by the Public Prosecutor. Further, the Public Prosecutor found that payment of consulting fees in no way influenced Dr. Preisig's regulatory work and that there was no evidence that any Cilag officers had attempted to influence Dr. Preisig's official work.
On December 12, 1986, plaintiff instituted this action in the Superior Court of New Jersey against defendants, alleging that he had been fired by J & J for his refusal to approve bribes to a Swiss pharmaceutical official. He asserted claims against defendants based upon theories of (1) wrongful termination (Count I); (2) intentional causation of injury (Count II); (3) conspiracy to deprive him of employment (Count III), and (4) libel and slander (Count IV). During the course of the litigation, the trial court granted defendants' motion to dismiss the complaint on the basis of forum non conveniens. We reversed in D'Agostino v. Johnson & Johnson, Inc., 225 N.J. Super. 250, 542 A.2d 44 (App.Div. 1987), aff'd o.b. 115 N.J. 491, 559 A.2d 420 (1989), holding that while Switzerland provided an adequate forum because many occurrences alleged by plaintiff to be pertinent to the law suit happened there, New Jersey was an equally appropriate forum. The Supreme Court affirmed and remanded the matter to the trial court for further proceedings. The Supreme Court, however, specifically pointed out, that "[i]n the absence of any discovery, there were insufficient facts available for any court to determine the extent to which Swiss law or New Jersey law would apply to aspects of this case." Id. 115 N.J. at 496-97, 559 A.2d 420. Also during the course of litigation, J & J appealed a trial court order requiring production of certain Cilag officials for depositions in New Jersey. We affirmed that order in D'Agostino v. Johnson & Johnson, *315 242 N.J. Super. 267, 576 A.2d 893 (App.Div.), certif. denied, ___ N.J. ___ (1990).
Thereafter, the trial court granted summary judgment in favor of defendants with respect to plaintiff's libel and slander claims under Count IV, but denied defendants' motion for summary judgment with respect to plaintiff's claims for wrongful termination under Count I, intentional causation of injury to another under Count II and conspiracy under Count III. The trial court held that New Jersey's contacts with this matter invoked New Jersey governmental interests which outweighed those of Switzerland, thereby justifying application of New Jersey law. In addition, the trial court held that under House v. Carter-Wallace Inc., 232 N.J. Super. 42, 556 A.2d 353 (App. Div.), certif. denied 117 N.J. 154, 564 A.2d 874 (1989), plaintiff's refusal to sign the payment vouchers raised factual issues as to whether plaintiff had undertaken "effective action" in opposition to an allegedly illegal corporate policy.
Defendants seek a reversal of the order denying summary judgment as to the remaining causes of action set forth in Counts I, II and III, and the entry of a judgment in their favor. They contend that the trial court should have applied the law of Switzerland, not the law of New Jersey, to this case. We agree.
The well settled law of this State has rejected the traditional choice of law rule in tort cases, lex loci delicti. Deemer v. Silk City Textile Mach. Co., 193 N.J. Super. 643, 648-49, 475 A.2d 648 (App.Div. 1984). Although lex loci delicti had the advantage of uniformity, predictability and certainty, Daily v. Somberg, 28 N.J. 372, 380, 146 A.2d 676 (1958), our courts have recognized that the doctrine "worked unjust results in many cases and ignored the interests which jurisdictions other than that where the tort occurred may have in the resolution of the particular issues involved." Pfau v. Trent Aluminum Co., 55 N.J. 511, 515, 263 A.2d 129 (1970); Mellk v. Sarahson, 49 N.J. 226, 228-29, 229 A.2d 625 (1967). To inject *316 more flexibility in the choice of law process, New Jersey has adopted the governmental interest analysis. Deemer, supra, 193 N.J. Super. at 649, 475 A.2d 648; see Pfau v. Trent Aluminum Co., supra, 55 N.J. at 514-15, 263 A.2d 129; Mellk v. Sarahson, supra, 49 N.J. at 229-31, 229 A.2d 625; see also D'Agostino v. Johnson & Johnson, Inc., supra, 115 N.J. at 496-497, 559 A.2d 420; State Farm Mut. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 34-37, 417 A.2d 488 (1980). In Veazy v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986), our Supreme Court summarized the governmental interest analysis as follows:
Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue. See, e.g., White v. Smith, 398 F. Supp. 130, 134 (D.N.J. 1975); McSwain v. McSwain, 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis. See, e.g., White v. Smith, supra, 398 F. Supp. at 134; R. Leflar, American Conflicts Law § 92, at 185 (3d ed. 1977); R. Weintraub, Commentary on the Conflict of Laws, § 6.9, at 285 (2d ed. 1980). If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. See, e.g., Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 32 (3d Cir.1975); White v. Smith, supra, 398 F. Supp. at 134-35; Schwartz v. Schwartz, 103 Ariz. 562, 564, 447 P.2d 254, 256 (1968); Pfau v. Trent Aluminum Co., supra, 55 N.J. at 516-23 [263 A.2d 129]. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. See Pfau v. Trent Aluminum Co., supra, 55 N.J. at 521-22 [263 A.2d 129]; Mellk v. Sarahson, supra, 49 N.J. at 230 [229 A.2d 625]. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply. See Henry v. Richardson-Merrell, Inc., supra, 508 F.2d at 32; White v. Smith, supra, 398 F. Supp. at 134.
The governmental interest analysis involves a two-step process: "the court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts of the parties with each related jurisdiction." Deemer, supra, 193 N.J. Super. at 649, 475 A.2d 648. A state's policy cannot arise in a vacuum. "A state is deemed interested only where application of its law to the facts in issue will foster that state's policy." Henry v. Richardson-Merrell, Inc., supra, 508 F.2d at 32. Moreover, in analyzing each *317 state's contacts "only contacts which are likely to promote valid state policies are considered relevant." Id. (citing Mullane v. Stavola, 101 N.J. Super. 184, 189, 243 A.2d 842 (Law Div. 1968)); see White v. Smith, supra, 398 F. Supp. at 134 ("[C]ontacts are considered, however, only to the extent that they are relevant to the purposes of the particular laws in conflict.").
Application of the governmental interest analysis here compels the conclusion that the trial court erred in holding that Swiss law did not apply and that New Jersey substantive law should govern this matter. At the outset, there is an actual conflict between the law of Switzerland and the law of New Jersey as it pertains to this case. Switzerland is an employment at will jurisdiction which accords employers great latitude in terminating employees. Switzerland does not recognize the public policy cause of action enunciated in Pierce v. Ortho Pharmaceutical Corp., supra. Thus, under the law of Switzerland, plaintiff would not have a cause of action for retaliatory discharge and, therefore, Swiss law would mandate the dismissal of plaintiff's retaliatory discharge claims. Moreover, plaintiff's counsel conceded this at oral argument on the first summary judgment motion, stating,
... I agree that under the law of Switzerland they do not have a cause of action for wrongful termination.
In addition, the Swiss Public Prosecutor thoroughly investigated plaintiff's charges and this investigation revealed no criminal wrongdoing in the payment to Dr. Preisig. Consequently, even assuming that plaintiff was terminated because of his refusal to approve internal payment orders for Dr. Preisig, plaintiff's discharge would not be wrongful under Swiss law.
Finally, even assuming that plaintiff's discharge could be considered wrongful, plaintiff failed to institute this action within one year of his termination and, therefore, this action is time-barred under Swiss law. The applicable Swiss statute of limitations is one year. Accordingly, plaintiff's wrongful discharge *318 claim as well as his related claims for intentional causation of injury and conspiracy to deprive him of employment are time-barred under Swiss law.
In contrast, New Jersey has adopted a policy of protecting New Jersey employees against discharge in violation of New Jersey's public policies. See Pierce v. Ortho Pharmaceutical Corp., supra. Thus, due to conflict between Swiss law and New Jersey law the policies underlying the law of each interested jurisdiction must be examined in the context of each jurisdiction's contacts with the litigation pursuant to the governmental interest test.
Plaintiff claims that he was fired for his refusal to approve payments, suspected by him to be illegal, to a Swiss pharmaceutical regulatory official. Plaintiff's claim is based on the cause of action created in Pierce v. Ortho Pharmaceutical Corp., supra. In Pierce, our Supreme Court recognized a wrongful discharge cause of action "when the discharge is contrary to a clear mandate of public policy." 84 N.J. at 72, 417 A.2d 505. The Pierce cause of action was created to balance the interests of three distinct groups:
Employees have an interest in knowing that they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees. [84 N.J. at 71, 417 A.2d 505].
In accommodating these interests, Pierce requires the discharged employee to identify a "specific expression of public policy" which is violated by the employee's discharge. Id. at 72, 417 A.2d 505. The Pierce cause of action must be defined on a case-by-case basis in accord with the public policy alleged to have been violated by the discharge. Thus, New Jersey's contacts must be analyzed in light of the policy behind the Pierce cause of action and in light of the underlying public policy the cause of action is attempting to vindicate.
*319 It is undisputed that plaintiff was a long-time Swiss resident when the events at issue occurred and was never a resident of New Jersey at any time relevant to the matter. Plaintiff negotiated for employment in Switzerland with Cilag and signed an employment contract in Switzerland. This contract provided that Swiss law would govern disputes arising from the employment relationship and that Schaffhausen, Switzerland would be the place of venue for such disputes. Plaintiff performed his duties in Switzerland and reported to superiors located in Switzerland. The only contact plaintiff had with New Jersey was his attendance at a conference of Managing Directors at J & J corporate headquarters in New Brunswick, New Jersey.
New Jersey's interests could not possibly be served by extending the Pierce cause of action to a foreign plaintiff under a foreign employment relationship. Plaintiff claims here that there exists "[a] `compelling' interest in preserving the job security of employees who refuse to engage in unethical or illegal conduct." He also claims that there exists an interest in "[p]rotecting the freedom of employees to decline to perform an act that would constitute a violation of a clear mandate of public policy." Both of these interests can be extrapolated from Pierce with regard to New Jersey employment relationships. However, the same cannot be said for the Swiss employment relationship involved in this case. New Jersey has an interest in preserving job security and stability in New Jersey. This interest does not extend to the preservation of job security in a foreign nation, like Switzerland. Here, New Jersey would not have a significant interest in preserving job security of a Swiss resident whose employment was in Switzerland. Similarly, New Jersey would not have a significant interest in protecting the freedom of a Swiss resident employed in Switzerland from performing acts in violation of public policy.
Case law supports the lack of a substantial governmental interest in litigation such as this on the part of New Jersey. For example, in Deemer v. Silk City Textile Mach. Co., supra, *320 which involved a product liability claim by a North Carolina resident in behalf of a North Carolina decedent who allegedly died due to injuries suffered in North Carolina while working on a machine manufactured in New Jersey, we held that even though the alleged tortious conduct (manufacture of a defective machine) occurred in New Jersey, there was no paramount New Jersey interest present since all other relevant incidents occurred in North Carolina. After pointing out that North Carolina chose not to extend strict liability protection to products liability suits to its citizens, we stated that there was "no compelling reason for us to extend to such non-domiciliary plaintiffs the benefits of our decisional law." 193 N.J. Super. at 651, 475 A.2d 648.
Similarly, in Henry v. Richardson-Merrell, Inc., supra, plaintiff was a Quebec, Canada resident allegedly suffering from multiple birth defects resulting from his mother's ingestion of the drug Thalidomide during pregnancy. New Jersey was one of 41 states where Thalidomide was tested. The drug was prescribed and ingested in Quebec and plaintiff was born in Quebec. However, Quebec's limitations period had lapsed and plaintiff filed suit in New Jersey, where his claims would not be time-barred. The Third Circuit Court of Appeals found that New Jersey would not extend the tolling provisions of its statute of limitations to "all plaintiff's from distant locales whose legislature had failed to afford similar protection." 508 F.2d at 37.
In Eger v. E.I. DuPont DeNemours Co., 110 N.J. 133, 539 A.2d 1213 (1988), our Supreme Court applied South Carolina law to a workers' compensation dispute because the situs of the plaintiff's employment relationship with the defendant general contractor was South Carolina, even though the plaintiff was a New Jersey resident directly employed by a New Jersey subcontractor. Notwithstanding those New Jersey contacts, the Eger court found that South Carolina had the most legitimate interest in the workers' compensation rights of workers injured while employed in South Carolina.
*321 Likewise, in this case, New Jersey has no interest in extending a wrongful termination cause of action to a Swiss resident where the law of Switzerland does not recognize such an action. Switzerland clearly is more interested than New Jersey in protecting job stability and preserving a right to refuse to violate Swiss public policy. However, Switzerland does not afford a cause of action to at-will employees for an alleged retaliatory termination and plaintiff's claims would be time-barred under Swiss law. Therefore, as in Eger, Henry and Deemer, New Jersey does not have a substantial interest in providing plaintiff protections unavailable to him in Switzerland under Swiss law.
The mere allegation that plaintiff's termination was somehow orchestrated at corporate headquarters in New Jersey is insufficient to accord New Jersey a substantial interest in extending the Pierce cause of action to a Swiss employment relationship between a Swiss resident and a Swiss subsidiary of the New Jersey parent corporation. Plaintiff contends that he was terminated due to his refusal to approve bribes to a Swiss pharmaceutical official. A scheme to bribe a foreign official emanating from New Jersey would ostensibly implicate the public policy of New Jersey, since such a scheme might be violative of the provisions of the Foreign Corrupt Practices Act, 15 U.S.C.A. § 78dd-1 et seq. Plaintiff contends that the scheme to bribe Dr. Preisig and the retaliatory termination of plaintiff's employment implicate New Jersey interests in "[d]eterrence of wrongdoing by corporations headquartered and doing business in this state" and in "[p]rotecting safety and public health concerns by insuring that the registration of pharmaceutical products is not carried out by fraudulent means."
Plaintiff alleges several contacts which link New Jersey to a scheme to bribe Dr. Preisig and the retaliatory termination of plaintiff's employment. Plaintiff asserts that he took direct instruction from J & J officers located in New Jersey, specifically, plaintiff cites the letter received from J & J's Office of *322 General Counsel regarding J & J's Policy Statement against use of corporate funds for illegal purposes. Plaintiff points out that this statement relates to his refusal to approve payments to Dr. Preisig; and that it was applicable to "J & J and all its domestic and foreign subsidiaries." Further, plaintiff notes that the letter from J & J's chairman, enclosed with the Policy Statement, states that the Policy Statement represents a "worldwide" policy, applicable to J & J employees like plaintiff. Plaintiff also cites the letter from Reinstadtler which emphasized the "mandatory" goal of gaining quick approval of new drugs made by J & J's "worldwide research centers." In addition, plaintiff stresses the significance of the meeting he attended in New Jersey and that the notices of his hiring and resignation were issued on J & J International letterhead, bearing a New Jersey address, and that these notices "were directed primarily to Johnson & Johnson's managers and Executive Committee in New Jersey." Moreover, plaintiff alleges that his superior's direct contacts with corporate headquarters tie New Jersey to this litigation. According to plaintiff, the managers of European subsidies like Cilag also served as directors of J & J International, which was located in New Brunswick, New Jersey. Plaintiff concludes that, "[e]very policy aspect pertaining to the Cilag subsidiary was controlled by J & J from New Jersey, including, most importantly, control over the surreptitious and recurring gifts of J & J stock to Dr. Preisig."
New Jersey undoubtedly has an interest in deterring future misconduct by corporations located and doing business in New Jersey. See Pfau, supra, 55 N.J. 511, 263 A.2d 129; Mueller v. Park Davis, 252 N.J. Super. 347, 354, 599 A.2d 950 (App.Div. 1991); Pine v. Eli Lilly & Co., 201 N.J. Super. 186, 192, 492 A.2d 1079 (App.Div. 1985); see also Schum v. Bailey, 578 F.2d 493, 501 (3d Cir.1978) (Gibbons, J., concurring). However, the focus of the governmental interest analysis in choice of law is not whether New Jersey has an articulable interest in having its law apply to this case. Rather, this court must "apply the *323 law of the state which has the greatest interest in having its law govern the particular matter in issue." White v. Smith, supra, 398 F. Supp. at 134 (emphasis added).
Although plaintiff alleges that a scheme to bribe a Swiss pharmaceutical official was hatched in New Jersey, Switzerland has a greater interest in the resolution of that matter. Here, the official involved was Swiss and the alleged plot involved regulatory duties in Switzerland. As plaintiff's expert on Swiss law, Dr. Andrea Jost, states: "[I]t is illegal to make or assist in making payments to an official, a public expert, or a member of an authority to induce or promote favorable treatment from the official, expert or member acting in his official capacity." Thus, if Dr. Preisig were paid consulting fees greatly exceeding the value of services he performed such that the payment was intended to influence Dr. Preisig in the course of his official duties in administrative proceedings, there would be a violation of Swiss criminal law.
The Swiss Public Prosecutor conducted an investigation of plaintiff's bribery allegations, and found them to be unsubstantiated. According to Professor Peter Nobel, under Swiss law, the decision to close a criminal investigation must be made by a judge. If any doubt exists as to whether the acts are criminal, the person must be indicted. Closing of the criminal investigation has the same effect as acquittal and reopening of the investigation requires "substantial and convincing evidence." Additionally, the fact that Dr. Preisig and Dr. Schmid were granted costs by the Swiss court is an indication that there was no evidence of criminal activity, since costs are not granted to investigated parties where authorities have "good cause" to investigate. Certainly, Switzerland has a greater interest than New Jersey concerning the bribing of a Swiss official, and as a matter of comity, this court should respect the finding of the Swiss Public Prosecutor.
Finally, we emphasize that inasmuch as the allegation of bribery might effect the process of registration of pharmaceuticals *324 in Switzerland, Switzerland has a greater interest in this dispute than does New Jersey. Dr. Preisig is an official of a Swiss organization which has no authority over drug registration in the United States. Even if Swiss registration of a drug would have influence on registration of that drug in the United States, this nation has its own stringent process for drug registration. See Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301, et seq. Moreover, we are in no position to say that the Swiss drug registration process must comport with United States standards for drug regulations. See Henry v. Richardson-Merrell, Inc., supra, 508 F.2d at 38-39 ("... New Jersey would not presume to tell a drug seller that its activity in Canada should be judged by the rules of New Jersey or for that matter by the United States Food and Drug Law"). Switzerland has the obvious and compelling interest in assuring the integrity of the Swiss pharmaceutical regulatory process.
In sum, we are thoroughly convinced that plaintiff, who is not domiciled or employed in New Jersey, does not have claim to the protection of New Jersey's public policy. Moreover, Switzerland has a clear interest in resolving plaintiff's bribery and wrongful discharge allegations. And, finally, Switzerland has the most significant contacts, both qualitatively and quantitatively, in this matter. Therefore, in this matter Switzerland has a far greater governmental interest than New Jersey and the law of Switzerland should have been applied by the trial court in resolving the summary judgment motion, not the law of New Jersey. Since there clearly was no cause of action for plaintiff's alleged retaliatory termination by Cilag under Swiss law and since plaintiff's claims are also time-barred under Swiss law, the action is dismissed.
Accordingly, the order of the Law Division denying the summary judgment is reversed and summary judgment is entered in favor of defendants against plaintiff with respect to the remaining causes of action.