628 A.2d 305

RICHARD J. D'AGOSTINO, PLAINTIFF–APPELLANT, v. JOHNSON & JOHNSON, INC., ROBERT N. WILSON AND RONALD G. GELBMAN, DEFENDANTS–RESPONDENTS.

Argued February 2, 1993—Decided August 4, 1993.

*Douglas V. Rigler,* a member of the District of Columbia bar, argued the cause for appellant (*Lasser, Hochman, Marcus, Guryan & Kuskin,* attorneys; *Mr. Rigler* and *Barry L. Eisenberg,* on the briefs).

*Alan E. Kraus* argued the cause for respondent (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Nicholas deB. Katzenbach,* of counsel; *Mr. Kraus, David P. Arciszewski,* and *Jeffrey M. Siminoff,* on the briefs).

The opinion of the Court was delivered by

O'HERN, J.

For a second time we review the 1985 employment dispute between Richard D'Agostino and the Johnson & Johnson Corporation and certain of its employees (hereinafter J & J or J & J defendants). In 1989, we reviewed the contention of J & J that plaintiff's complaint should be dismissed under the doctrine of *forum non conveniens.* J & J argued that New Jersey was an inconvenient forum for resolution of the dispute more properly brought in a Swiss court, because D'Agostino was a resident of Switzerland and had been employed by a Swiss subsidiary of J & J. On that first occasion, we affirmed substantially for the reasons stated in the Appellate Division opinion, reported at 225 *N.J.Super.* 250, 542 A.2d 44, holding that the matter could proceed in New Jersey. 115 *N.J.* 491, 559 A.2d 420 (both cases hereinafter *D'Agostino* I). At that time, we expressed the reservation that resolution of the *forum non conveniens* issues did not foreclose or foreshadow any issue of substantive law, including choice-of-law questions that could be better addressed following an exchange of discovery. *Ibid.*

Following the completion of discovery, the core issues, according to the trial court, remain as "hotly disputed" as they had been at the outset of the case. Plaintiff continues to assert that at the behest of defendants he was wrongfully discharged from employment with J & J's subsidiary because he refused to participate in what he perceived to be an illegal bribing of Swiss licensing

authorities. J & J continues to insist that no illegal payments were involved, but only consulting fees, which are perfectly proper under Swiss law.

 In this appeal we must consider the question left open under *D'Agostino* I, namely, whether Swiss or domestic law governs the claims asserted in the New Jersey forum against a New Jersey corporation and its officers. We hold that because the underlying controversy 1) involves an alleged violation in New Jersey of the Foreign Corrupt Practices Act, 15 *U.S.C.A.* §§ 78dd–1 to –2 (hereinafter FCPA), which sets forth a domestic policy against bribery of a foreign regulatory official; 2) involves the participation of a United States citizen who might have been exposed to criminal prosecution had the conduct violated the FCPA and was an alleged violation of a New Jersey corporation's internal policy against such overseas commercial bribery; and 3) because violation of the governmental policies could have an indirect effect on the domestic market for pharmaceutical products and the health and welfare of this forum's citizens, New Jersey's interests in resolving this dispute under its laws outweigh the Swiss interest in the at-will employment relationship that would not seek to deter such conduct through its civil law.

## I

We hasten to emphasize at the outset of this opinion that these charges against the J & J defendants remain simply that: unproven allegations. Because the case comes before us on a motion for summary judgment, the facts are assumed to be as plaintiff alleges them, and plaintiff is entitled to "all reasonable inferences that may be drawn in [his] favor." *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 61, 417 A.2d 505 (1980) (citing *R.* 4:46–2).

D'Agostino, a United States citizen and a long-time resident of Switzerland, was hired in December 1984 by J & J's wholly-owned overseas subsidiary, Cilag, as General Manager of Cilag's Swiss Marketing Division. Although born in Newark and raised during early childhood in East Orange, at no time during this case has

plaintiff been a New Jersey resident. Plaintiff was hired through the efforts of an employment agency chosen by J & J and was interviewed by a J & J organization in Germany. In accepting employment, plaintiff expressed the hope that he was entering into a long-term career with J & J with the eventual prospect of a United States-based position. Plaintiff signed an employment contract with Cilag in Switzerland on December 21, 1984. The agreement provided that either party could terminate the employment relationship on six-months notice and that Swiss law would govern any disputes under the contract. Plaintiff's employment with Cilag was announced on the letterhead of J & J International, a New Jersey company, on February 14, 1985.

D'Agostino began working for Cilag at its Schaffhausen, Switzerland location in April 1985. His responsibilities included the marketing and registration in Switzerland of pharmaceutical products developed by Cilag and other J & J subsidiaries. D'Agostino reported to Dr. Hans Schmid, Chairman of Cilag, and Paul G. Reinstadtler, Managing Director of Cilag, Germany.

On June 4, 1985, plaintiff received a letter from the office of General Counsel of J & J in New Jersey reminding him to execute and return to New Jersey an acknowledgement of adherence to a J & J Policy Statement, which he had first received on January 5, 1985. The Policy Statement called for the certification that the employee would comply with J & J's policy against the use of corporate funds for unlawful purposes, including bribes, illegal political contributions, or payoffs. Plaintiff asserts that although he asked to see the Policy Statement before returning his acknowledgment, he was bound by the policy nonetheless.

On June 8, 1985, plaintiff participated in a worldwide J & J management meeting in New Jersey. Discussions included the registration in Switzerland of the synthetic hormone Immunox. Robert Wilson, Vice Chairman of J & J and Executive Vice President of J & J International, allegedly inquired about the registration status of Immunox. When plaintiff stated that the Swiss authorities had rejected registration for the second time,

Dr. Schmid and Dr. Hans Balthasar, a Vice President of J & J International and an employee of Cilag, assured J & J management that the matter was under control.

On June 24, 1985, shortly after returning to Switzerland, D'Agostino received a voucher from Dr. G. Kretzschmar, a Cilag executive, seeking payment of "consulting fees" to Dr. Rudolph Preisig. Dr. Preisig was the President of the College of Experts, an advisory committee to the Intercantonal Office of the Control of Medicaments, which controls the registration of new drugs in Switzerland. Plaintiff refused to sign the voucher, suspecting the payment to be a bribe, and sought information. On June 25, 1985, Dr. Kretzschmar presented a second payment voucher for a lesser amount to D'Agostino. Once again, D'Agostino refused to approve the payment. Several days later, after receiving a dossier on Dr. Preisig, D'Agostino discussed the matter with Dr. Kretzschmar. He was told that no contract with Dr. Preisig existed. D'Agostino states that Dr. Kretzschmar told him, "you have to pay, you have to go along. He says, it has been going on for a long time. Be happy that it wasn't more."

On July 23, 1985, plaintiff was asked for "a second or third time" to authorize the payments for Dr. Preisig. Plaintiff met with his supervisor, Reinstadtler, and Dr. Kretzschmar and again refused to sign the voucher without a better explanation. According to D'Agostino, Reinstadtler left the meeting to make a phone call. The next day, July 24, 1985, plaintiff was notified by Reinstadtler that Dr. Schmid had decided to discharge him. Plaintiff asserts that he notified J & J's General Counsel, in late July, in New Brunswick, and an executive of J & J in Sprittenbach, Switzerland, about suspected violations of the company's Policy Statement concerning unlawful bribes and payoffs. A separation agreement was negotiated, but plaintiff never signed it. Dr. Schmid, Chairman of Cilag and Vice President of J & J International, issued a resignation announcement on August 1, 1985, on J & J International letterhead.

Thereafter, plaintiff claims that matters went from bad to worse. J & J allegedly conspired to deprive him of employment in the pharmaceutical industry and defamed his business reputation. On November 3, 1986, Cilag filed a declaratory-judgment action in Switzerland seeking a judgment to establish that D'Agostino had no claims against Cilag resulting from his termination. D'Agostino did not appear, and on November 26, 1986, the complaint was dismissed. On January 20, 1987, Cilag filed another declaratory-judgment action. The Swiss court, on May 3, 1988, dismissed the declaratory-judgment suit, holding that D'Agostino's claims, outside the contract and being pursued in New Jersey, involved many uncertainties, thereby making Cilag's declaratory-judgment action impossible to grant.

In between Cilag's filing of the two declaratory-judgment suits in Switzerland, D'Agostino, on November 20, 1986, filed a criminal complaint in Switzerland, accusing Cilag of bribing Dr. Preisig. On July 31, 1987, after what has been described by the Appellate Division as a "thorough investigation," the examining magistrate found no impropriety.

"The accusation that the payments concerned were intended as gifts, or as improper advantages offered to Professor Preisig, is therefore conclusively refuted—in retrospect, the accusation must have arisen from the fact that the accuser was totally unaware of the actual situation."

[255 *N.J.Super.* at 314, 605 *A.*2d 252 (quoting examining magistrate).]

Before the Swiss magistrate's decision, and prior to the second declaratory-judgment suit, plaintiff, on December 4, 1986, brought this civil suit in New Jersey for damages against J & J, Robert Wilson, the Vice–Chairman of its Executive Committee, and Ronald Gelbman, President of Ortho Diagnostic Systems, Inc., a corporate affiliate. Plaintiff claims that defendants directed Cilag, J & J's wholly-owned Swiss subsidiary, to terminate his employment because he refused to approve the payment of bribes to a Swiss governmental official. The complaint also asserts that defendants made defamatory statements concerning his dismissal and that they entered into a conspiracy to prevent him from obtaining employment in the pharmaceutical industry. The com-

plaint asserts (1) wrongful termination, (2) intentional causation of injury to another, (3) conspiracy, and (4) libel and slander.

## II

We omit reference to various intermediary proceedings, including discovery disputes that the Appellate Division had to resolve. Discovery has been completed. This appeal concerns J & J's second motion for summary judgment. The trial court, concluding that New Jersey law would govern the dispute, granted summary judgment on the defamation count and denied summary judgment on the remaining counts. The Appellate Division reversed, concluding that Swiss law governed the dispute. 255 *N.J.Super.* 307, 605 *A.2d* 252.

■ Both courts used the same method of analysis. For determining choice-of-law, New Jersey no longer follows the rule that the place where the wrong occurred controls. *Veazey v. Doremus,* 103 *N.J.* 244, 247, 510 *A.2d* 1187 (1986). Today, New Jersey uses "the more flexible governmental-interest analysis in choice-of-law decisions." *Ibid.* "Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue." *Id.* at 248, 510 *A.2d* 1187. Once a conflict is determined

the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

[*Ibid.* (citations omitted).]

The trial court, based on the choice-of-law analysis in *Veazey,* addressed New Jersey's and Switzerland's policies underlying the retaliatory-discharge claim to determine which law would govern the dispute. Switzerland, an employment-at-will jurisdiction, encourages uninhibited hiring and termination of employment relationships and, unlike New Jersey, does not recognize an action for

wrongful discharge. In an oral opinion the trial court recognized several factors implicating Swiss law. First, plaintiff was a long-time resident of Switzerland and had sought employment there. Second, plaintiff had signed the employment contract in Switzerland and specifically had agreed that Swiss law would govern any disputes. Finally, the alleged bribery implicates the integrity of the Swiss pharmaceutical regulatory process.

On the other hand, the trial court identified several governmental interests supporting the choice of New Jersey law. First, New Jersey "has a compelling interest to preserve job security of employees who refuse to partake in illegal and unethical conduct." Second, New Jersey has an interest in providing a forum to allow legal redress to a plaintiff who may have been the victim of a conspiracy, "masterminded in New Jersey by a New Jersey corporation," to bar him from employment in the pharmaceutical industry. Finally, the court emphasized J & J's corporate Policy Statement forbidding employees from using corporate funds for unlawful purposes. The trial court concluded that "New Jersey's governmental interest outweigh[s] that of Switzerland, especially since Switzerland has refused to hear plaintiff's complaint."

The Appellate Division reversed and granted summary judgment, holding that the law of Switzerland governed the dispute. Applying the governmental-interest analysis described in *Veazey*, the court examined the "policies underlying the law of each interested jurisdiction * * * in the context of each jurisdiction's contacts with the litigation." 255 *N.J.Super.* at 318, 605 *A.*2d 252. It focused on New Jersey's interests in the *Pierce* doctrine itself. *See Pierce, supra,* 84 *N.J.* 58, 417 *A.*2d 505. Under *Pierce,* a "discharged employee [must] identify a 'specific expression of public policy' [that] is violated by the employee's discharge." 255 *N.J.Super.* at 318, 605 *A.*2d 252 (quoting *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505). However, the Appellate Division concluded that New Jersey's interests could not possibly be served by extending the *Pierce* cause of action to a foreign plaintiff under a foreign employment relationship. * * * New Jersey has an interest in preserving job security and stability in New Jersey. This interest does not extend to the preservation of job security in a foreign nation, like Switzerland. Here, New Jersey would not have a significant interest in preserving job security of a Swiss resident whose employment was in

Switzerland. Similarly, New Jersey would not have a significant interest in protecting the freedom of a Swiss resident employed in Switzerland from performing acts in violation of public policy.

[255 *N.J.Super.* at 319, 605 *A.*2d 252.]

The court further concluded that

New Jersey has no interest in extending a wrongful termination cause of action to a Swiss resident where the law of Switzerland does not recognize such an action. Switzerland clearly is more interested than New Jersey in protecting job stability and preserving a right to refuse to violate Swiss public policy.

[*Id.* at 321, 605 *A.*2d 252.]

Although the court recognized that New Jersey "has an interest in deterring future misconduct by corporations located and doing business in New Jersey," *id.* at 322, 605 *A.*2d 252, and that if plaintiff's termination was somehow "orchestrated" at J & J headquarters, New Jersey would have some interest in extending *Pierce* to such a cause of action, the court nevertheless concluded that it is not the state with an *"articulable interest,"* but rather the state with the *"greatest interest"* whose law should govern the case. *Id.* at 322–23, 605 *A.*2d 252.

Turning to Switzerland's interests the court held that Switzerland has a greater interest in the case. The alleged bribe involved a Swiss official and his regulatory duties. "Certainly, Switzerland has a greater interest than New Jersey concerning the bribing of a Swiss official * * *." *Id.* at 323, 605 *A.*2d 252. The court concluded that to the extent the alleged bribe might influence the registration of pharmaceuticals in Switzerland, Switzerland has the greater interest. *Id.* at 323–24, 605 *A.*2d 252. The court did not rely on the influence of the registration of a drug in Switzerland on the registration of the drug in the United States, because "this nation has its own stringent process for drug registration." *Id.* at 324, 605 *A.*2d 252. The court concluded that "Switzerland has the obvious and compelling interest in assuring the integrity of the Swiss pharmaceutical regulatory process." *Ibid.* The Appellate Division held that because Switzerland has the greater governmental interest, Swiss law would govern the dispute. *Ibid.* We granted certification, 130 *N.J.* 396, 614 *A.*2d 618 (1992).

## III

The determinative law is "that of the state with the greatest interest in governing the *particular issue*" and that the "*qualitative,* not the *quantitative,* nature of a state's contacts ultimately determines whether its law should apply." *Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187 (emphasis added). In their Appellate Division brief, defendants pose the issue this way: "There is a single fact that is dispositive of this appeal and that fact is undisputed: the employment relationship at issue was a Swiss employment relationship. New Jersey has no cognizable interest in regulating Swiss employment relationships." Of course that is true. New Jersey has no interest in regulating Swiss employment relationships. But this case is not about regulating just Swiss employment relationships. It is as much about regulating the conduct of parent companies in New Jersey that engage in corrupt practices through a subsidiary's employees. For the "particular issue" here is the tort liability of a domestic corporation for ordering and directing the discharge of a subsidiary's employee for the refusal to participate in corrupt practices. That issue is not encapsulated within a Swiss employment doctrine but embraces as well the conduct here of a New Jersey parent company that has assertedly engaged in conduct that would violate a clear mandate of public policy. Defendants and the Appellate Division agreed that New Jersey has virtually no interest in this dispute because the terms of the *Pierce* doctrine do not extend to a foreign resident employed in another country. But the *Pierce* doctrine is policy neutral. It draws its life only from the underlying state policy and applies only when the underlying state policy applies. The question is: does the FCPA constitute a state policy and does the FCPA have an intended extraterritorial effect?

### A.

We will consider first whether a clear mandate of public policy relates to a domestic company's overseas activities, and then

examine New Jersey's contacts with that mandate, if it exists, in the circumstances of this case.

In New Jersey, in the absence of a contract, an employee may be fired for any reason, be it good cause, no cause, or even morally-wrong cause, but not when the discharge is contrary to a clear mandate of public policy. *Woolley v. Hoffman LaRoche, Inc.,* 99 *N.J.* 284, 290–91, 491 *A.*2d 1257 (discussing *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505), *modified,* 101 *N.J.* 10, 499 *A.*2d 515 (1985); *see also* the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (protecting employee from retaliatory discharge, including when employee refuses to participate in activity that violates law, regulation, or rule; is criminal; or is against clear mandate of public policy concerning public health, safety, welfare, or environment). Courts do not create their own public policy; however, "[t]he sources of public policy are varied." *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 90, 609 *A.*2d 11 (1992). In *Pierce, supra,* we stated:

> The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. * * * Absent legislation, the judiciary must define the cause of action in case-by-case determinations.

[84 *N.J.* at 72, 417 *A.*2d 505.]

An employee cannot be discharged for "refus[ing] to perform an act that is a violation of a clear mandate of public policy." *Ibid.* In this case plaintiff did not emphasize the Conscientious Employee Protection Act, perhaps because it became effective after the date of these occurrences or because of substantive concerns. In any event, that Act signals a clear statement of public policy in wrongful-discharge cases.

The Appellate Division recognized that New Jersey has a significant interest in preserving job security and stability in New Jersey. 255 *N.J.Super.* at 318, 605 *A.*2d 252. However, the court could not determine what clear mandate of public policy New Jersey had in extending the *Pierce* cause of action to a foreign

resident in a foreign employment situation. *Id.* at 319, 605 *A.*2d 252. As we see the issue, the answer to that question depends on the source of public policy and whether the underlying policy that energizes the application of the *Pierce* doctrine is intended to have an overseas effect. In answering that question, we apply the analysis set forth in *Hennessey.*

1.

Federal law and policy can constitute New Jersey's clear mandate of public policy. In *Potter v. Village Bank,* 225 *N.J.Super.* 547, 560, 543 *A.*2d 80 (App.Div.), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988), the court found a clear mandate of public policy from a federal banking statute and regulations governing reporting cash transactions. The court affirmed a jury's finding that the plaintiff had established his retaliatory discharge claim for being fired for reporting what he had suspected was drug money laundering through the bank. *Potter* is consistent with decisions of this Court and other courts that have found a wrongful-discharge cause of action when based on a clearly-articulated federal policy. *See, e.g., Wheeler v. Caterpillar Tractor Co.,* 108 *Ill.*2d 502, 92 *Ill.Dec.* 561, 485 *N.E.*2d 372 (1985), *cert. denied,* 475 *U.S.* 1122, 106 *S.Ct.* 1641, 90 *L.Ed.*2d 187 (1986) (finding clear mandate of public policy in regulations of Nuclear Regulatory Commission); *Phipps v. Clark Oil & Ref. Corp.,* 408 *N.W.*2d 569 (Minn.1987) (adopting federal Clean Air Act and its regulations as state policy); *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192–93 & n. 1, 536 *A.*2d 237 (1988) (finding clear mandate of public policy in federal employment-discrimination case law); *Sabine Pilot Service, Inc. v. Hauck,* 687 *S.W.*2d 733, 735 (Tex.1985) (adopting as public policy laws of "the United States which carry criminal penalties"; one such law makes it illegal to pump a boat's bilges into the water); *cf. Lepore v. National Tool and Mfg. Co.,* 224 *N.J.Super.* 463, 473–74, 540 *A.*2d 1296 (App.Div.1988) (finding "cause of action for wrongful and tortious retaliatory conduct by the employer which may be pursued in lieu of contractual arbitration" for employee who reported safety violations to OSHA), *aff'd,*

115 *N.J.* 226, 557 *A.*2d 1371, *cert. denied,* 493 *U.S.* 954, 110 *S.Ct.* 366, 107 *L.Ed.*2d 353 (1989).[1]

■ We now turn to the specific source of that public policy, the FCPA. Three courts have addressed adopting the FCPA policies as state policies. In *Thompson v. St. Regis Paper Co.,* 102 *Wash.*2d 219, 685 *P.*2d 1081, 1089 (1984), the court recognized a tort action for wrongful discharge of an employee for "reasons that contravene a clear mandate of public policy." The plaintiff, a Washington resident working for a Washington company, alleged, among other things, that he had been "fired for instituting an accurate accounting program in compliance with the" FCPA. *Id.* 685 *P.*2d at 1090. The Washington Supreme Court adopted the FCPA policies as state policies.

> The Foreign Corrupt Practices Act is a clear expression of public policy that bribery of foreign officials is contrary to the public interest and that specific companies, St. Regis for one, must institute accounting practices to ensure that this public policy is advanced. If appellant's discharge was premised upon his compliance with the accounting requirements of the Foreign Corrupt Practices Act and intended as a warning to other St. Regis controllers, as appellant alleges, then his discharge was contrary to a clear mandate of public policy and, thus, tortious.

> [*Ibid.*]

On the other hand, an Illinois intermediate court of appeals has refused to recognize the validity of the FCPA as a clear statement of Illinois policy. In *Pratt v. Caterpillar Tractor Co.,* 149 *Ill. App.*3d 588, 102 *Ill.Dec.* 900, 500 *N.E.*2d 1001 (1986), *appeal*

---

[1] One court has recognized foreign law as implicating a state contract-law policy. In *Crossen v. Foremost–McKesson, Inc.,* 537 *F.Supp.* 1076 (N.D.Cal. 1982), the plaintiff worked in Thailand for Foremost Dairies (Bangkok) Ltd. The plaintiff alleged an implied-in-law covenant of good faith and fair dealing in the employment contract and wrongful termination because he had sought to correct violations of Thailand, California, and United States law. The court held that "refusing to personally violate Thai law, and thereby subject[ing] himself to the risk of imprisonment, establishes a cause of action for breach of the implied-in-law covenant of good faith and fair dealing." *Id.* at 1078. The court did not allow the wrongful-discharge claim because the California courts had yet to recognize such a claim and because of the duplication of elements and damages with the breach-of-implied-covenant claim.

*denied,* 114 *Ill.*2d 556, 107 *Ill.Dec.* 68, 506 *N.E.*2d 959 (1987), the plaintiff was employed by a subsidiary of Caterpillar Tractor Company in Switzerland. Among other things, Pratt alleged that he had been fired because he would not engage in conduct that violated the FCPA. The court determined that the FCPA did not "establish a public policy of the State of Illinois sufficient to create a basis for our State's tort of retaliatory discharge." *Id.* 102 *Ill.Dec.* at 901, 500 *N.E.*2d at 1002. Dissenting from the denial of leave to appeal, Justice Simon stated:

> Considering both the supremacy clause of the United States Constitution and the plenary authority of the federal government in matters of foreign affairs it is difficult to conceive of a United State[s] foreign policy which is not also the policy of this State and intended for the protection of its citizens. * * * If the Foreign Corrupt Practices Act and the Export Control Act do not represent policies adopted by the citizens of the fifty States, then whose policies are they?
>
> [107 *Ill.Dec.* at 68, 506 *N.E.*2d at 959 (citations omitted).]

In an earlier case, however, the Illinois Supreme Court had emphasized that if the federal policy had an impact on the domestic welfare of citizens, the federal law would constitute a clear mandate of state policy. *Wheeler, supra,* 92 *Ill.Dec.* at 566, 485 *N.E.*2d at 377 (finding retaliatory discharge cause of action when plaintiff requested transfer and was subsequently fired for refusal to operate X-ray machine that allegedly violated regulations of Nuclear Regulatory Commission pursuant to Atomic Energy Act). "The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect." *Ibid.;* *see also Johnson v. World Color Press, Inc.,* 147 *Ill.App.*3d 746, 101 *Ill.Dec.* 251, 498 *N.E.*2d 575 (1986) (adopting federal securities act as mandate of state public policy), *appeal denied,* 113 *Ill.*2d 575, 106 *Ill.Dec.* 47, 505 *N.E.*2d 353 (1987).

In *Adler v. American Standard Corp.,* 538 *F.Supp.* 572, 577 (D.Md.1982), *aff'd and rev'd on appeal on other grounds,* 830 *F.*2d 1303 (4th Cir.1987), the plaintiff claimed abusive discharge resulting from, among other things, his discovery of alleged bribes of

Mexican officials in violation of the FCPA. The court concluded that "[a] clear mandate of public policy was allegedly contravened by this discharge." *Id.* at 578. *Compare* 830 *F.*2d at 1307 (plaintiff failed to prove at trial any violation of seventeen federal statutes, and without showing a "refusal to engage in illegal activity" or more than just "intention to 'blow the whistle' " no violation of mandate of public policy appeared). The district court rejected the defendant's arguments that federal law cannot be a source of Maryland public policy contravened by the wrongful discharge.

> The civil law remedy in Maryland for an abusive discharge does not seek to enforce federal law nor to regulate activities thereunder; it does seek to foster and promote the policy of that law. This does not offend federal sovereignty, nor the Federal Constitution, nor does it have extraterritorial effect. * * *
>
> * * * If defendant's arguments were to be adopted, this Court would accept the proposition that the State of Maryland, as a matter of public policy of its own, should not be concerned with serious violations of federal law resulting from acts of bribery. * * * This Court cannot agree that the State of Maryland should close its eyes and, as a matter of policy, not be concerned with violations of federal law.

[538 *F.Supp.* at 578–79.]

We agree with those cases specifically adopting the FCPA as a state policy. We find persuasive the rationales in *Adler, Thompson* and Justice Simon's dissent in *Pratt.* They are consistent with our State views about adopting federal law as a State policy. See discussion and cases *supra* at 528, 628 *A.*2d at 312.

2.

Our analysis is not finished. The mere existence of a policy does not mean that it will be invoked. "A 'clear mandate of public policy' must be one that on balance is beneficial to the public." *Hennessey, supra,* 129 *N.J.* at 100, 609 *A.*2d 11. That requires a weighing of the competing interests. We do not profess to be experts on the nuances of the FCPA, and set forth only what appears to us to be its contours.

The FCPA makes unlawful the giving of a gift to a foreign official in order to influence a decision of a foreign government. 15 *U.S.C.A.* §§ 78dd–1, –2.

> The FCPA was intended to stop bribery of foreign officials and political parties by domestic corporations. Bribery abroad was considered a "severe" United States foreign policy problem; it embarrasses friendly governments, causes a decline of foreign esteem for the United States and casts suspicion on the activities of our enterprises, giving credence to our foreign opponents. H.R.Rep. No. 640, 95th Cong., 1st Sess. 5 (1977). The FCPA thus represents a legislative judgment that our foreign relations will be bettered by a strict anti-bribery statute.
>
> [*Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 *F.*2d 404, 408 (9th Cir.1983) (footnote omitted), *cert. denied*, 464 *U.S.* 1040, 104 *S.Ct.* 703, 79 *L.Ed.*2d 168 (1984).]

The FCPA expresses a strong public interest against the bribing of foreign officials by domestic companies.

In recognizing the *Pierce* cause of action we acknowledged the balancing of the "interests of the employee, the employer, and the public." 84 *N.J.* at 71, 417 *A.*2d 505.

> Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

> [*Ibid.*]

We determined that the public's interest in the development, subject to FDA approval, of drugs designed to protect and promote the health of humankind outweighed an individual's understanding of the physician's oath.

In this case, a public policy is violated. Congress, through the FCPA, has expressed a need to protect the public against the bribing of foreign officials by domestic companies. That federal policy represents a clear mandate of state policy, especially when a violation of the federal policy has an impact on the health and welfare of the forum state. The record contains evidence that members of the College of Experts participated in institutional review boards analyzing clinical results for drugs Cilag was attempting to register in Switzerland. Those boards were necessary not for registration in Switzerland but for the Swiss docu-

ments to be used in the United States for the registration of the drug by the Food and Drug Administration. New Jersey is a worldwide leader in the pharmaceutical markets. The effect of commercial bribery abroad has a potential effect on New Jersey and the health and welfare of its citizens.

On the other side of our balancing analysis is the interest of comity that is implicated by the extraterritorial application of the FCPA in a wrongful-discharge case. The FCPA expressly applies extraterritorially to United States citizens working for foreign subsidiaries of domestic companies. 15 *U.S.C.A.* § 78dd–2(a)(2)(B) (subjecting United States citizen working overseas to five-years imprisonment for violating FCPA). "[A]pplication of United States law to *United States nationals* abroad ordinarily raises considerably less serious questions of international comity than does the application of United States law to *foreign nationals* abroad." *EEOC v. Arabian Am. Oil Co.,* —— *U.S.* ——, ——, 111 *S.Ct.* 1227, 1244, 113 *L.Ed.*2d 274, 299 (1991) (Marshall, J., dissenting). In *EEOC* the Court explained that because Congress did not intend the protections of Title VII to apply to United States citizens employed by American employers in foreign countries, overseas practices of subsidiaries were not subject to the law.

However, Congress has since legislatively overruled the Supreme Court. 42 *U.S.C.A.* § 2000e–1(c); *Stender v. Lucky Stores, Inc.,* 780 *F.Supp.* 1302 (N.D.Cal.1992). Unlike its original intent in Title VII, Congress explicitly intends that the FCPA apply to conduct of American companies and employees in foreign countries. We note that "[b]ecause two different rules of construction apply depending on the national identity of the regulated parties, the *same* statute might be construed to apply extraterritorially to United States nationals but *not* to foreign nationals." *EEOC, supra,* —— U.S. at ——, 111 *S.Ct.* at 1244, 113 *L.Ed.*2d at 299 (Marshall, J., dissenting). We also note that the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8, has codified much of the common-law retaliatory-discharge claim and includes an activity that is a violation of law or a crime. We do not suggest that the "whistle blower" act itself has an extraterritorial effect;

rather it reflects our common-law employment law, which will apply extraterritorially only when the underlying clear mandate of public policy is intended to have an extraterritorial effect.

Not only can federal policy constitute state policy, it can also apply extraterritorially when Congress intends that the policy have overseas applications. The FCPA is intended to govern United States citizens abroad, and applying the policies of the FCPA to D'Agostino's claim is an intended and permissible extraterritorial effect. In declining to assert jurisdiction over foreign subsidiaries the FCPA focuses liability on the parent and the United States national acting as its overseas operative. See Phillip Blumberg, *The Law of Corporate Groups: Parent and Subsidiary Corporations Under Statutory Law Specifically Applying Enterprise Principles* § 23.05.1, § 23.05.4 (1992) (discussing legislative history and conference committee's exclusion of foreign subsidiaries and concluding that "[w]here the American parent makes use of a foreign subsidiary or its personnel to obtain or retain business, either for itself or for any subsidiary in the group (or, for that matter, for anyone else), the Act will manifestly be construed to cover such activity"). One court recently summarized the FCPA Conference Report as stating "that American parent corporations would remain indirectly liable for violations of the FCPA by a subsidiary" and "that United States individuals (citizens, nationals or residents) could be liable if acting in relation to the affairs of a foreign subsidiary of an issuer or domestic concern." *Dooley v. United Technologies Corp.*, 803 *F.Supp.* 428, 439 (D.D.C.1992). Not only could D'Agostino be liable under the FCPA, but more likely J & J could be held liable as a parent of a subsidiary whose agent bribed a foreign official.

In *Hennessey, supra,* we determined that the public's interest in public safety outweighed the employee's individual right to privacy. 129 *N.J.* at 107, 609 *A*.2d 11. That case involved the random drug testing of an employee in the safety-sensitive position of regulating the flow of gasoline products at a refinery. The FCPA's policy of preventing the bribery of foreign officials by domestic companies, combined with the alleged reason for the

bribe—to influence the registration of drugs in Switzerland and the United States—suggests a strong public interest in this case. Any opposing interest involving extraterritoriality does not outweigh this forum's interests in preventing bribery, which could have a negative impact on public health and safety in New Jersey. Having determined that the mandate of public policy is beneficial to the public, we must consider New Jersey's and Switzerland's "contacts" with the potential tort liability of a domestic corporation for ordering and directing the discharge of a foreign subsidiary's employee for the refusal to participate in corrupt practices.

### . B.

The second part of the *Veazey* test calls for a qualitative analysis of Switzerland's and New Jersey's contacts with respect to the "particular issue." 103 *N.J.* at 248, 510 *A.*2d 1187. We recognize that Switzerland has an interest in governing the employment relationships between a Swiss company and a Swiss resident. Switzerland does have an undoubted interest in preventing bribery, although that interest is not a policy effectuated through such Swiss employment law; rather, it is a policy underlying Swiss criminal law. And Switzerland does have a strong interest in maintaining a uniform approach to employee/employer relations (as with any state), especially when one considers its small size, location, tradition of neutrality, and openness to trade, foreign business, and foreign employees. Thus, Switzerland has an interest in having its law apply to an employment relationship involving a Swiss resident and a Swiss company. See *Shamley v. ITT Corp.*, 869 *F.*2d 167 (2d Cir.1989) (choosing New York at-will employment law in wrongful discharge action involving a New Jersey resident who worked and was fired in New York). But it does not have an interest in condoning corporate bribery orchestrated beyond its boundaries.

This is not a case (allegedly) in which an obscure overseas operative of J & J was involved in commercial bribery unknown to the home office. At oral argument counsel for J & J had to

concede, in the procedural posture of the case, that we must decide the choice-of-law question as if what plaintiff called the "driving engine" and scheme to bribe and fire were "headquarters generated" and that the bribes were intended and expected to affect the regulatory process. J & J in New Jersey requested that D'Agostino certify that he would comply with the Policy Statement against the use of corporate funds for unlawful purposes such as bribes or payoffs. In that sense the New Jersey employer's Policy Statement mirrors the clear mandate of public policy against partaking in illegal or unethical conduct overseas established by the FCPA. Plaintiff's counsel, during argument, discussed the cruel anomaly of J & J's position that a foreign subsidiary's employee could be fired by J & J in New Jersey for bribing an official but that same employee is not protected from discharge for refusing to violate the Policy Statement. According to plaintiff's counsel, such an arrangement is a "blueprint for corruption." As advocated by J & J, the Policy Statement establishes a discordant mutuality of obligation under which an employee may be fired for proceeding with a bribe but would not be protected if the employee refused the parent company's direction to bribe. The employee is given a Hobson's choice: go along with the bribe and get fired by the home office; refuse to make the bribe and get fired by the overseas affiliate.

In addition, D'Agostino was hired through the efforts of an employment agency chosen by J & J and was interviewed by the J & J organization in Germany, not in Switzerland. D'Agostino thought he was entering into a long-term career with J & J that would eventually involve a United States-based position with the company. Both D'Agostino's hiring and termination announcements were issued by J & J's international subsidiary in New Jersey and distributed to J & J's managers and Executive Committee in New Jersey. Plaintiff's firing followed shortly after a meeting at J & J's corporate headquarters in New Jersey at which the unsuccessful registration of a drug was discussed.

Those alleged facts and inferences reveal J & J's extensive supervisory role and involvement in Cilag and D'Agostino's em-

ployment situation. As noted, the thesis of plaintiff's case is that J & J orchestrated in New Jersey the bribing of a foreign official, allegedly in violation of the FCPA and potentially subjecting a United States citizen to criminal prosecution, and plaintiff's subsequent dismissal for failing to pay the bribe. If proven, the extensive New Jersey contacts and the qualitative nature of the underlying controversy lead us to conclude that New Jersey law should govern this dispute.

## C.

Hence we distinguish four cases relied on by defendants. *Deemer v. Silk City Textile Machinery Co.*, 193 *N.J.Super.* 643, 475 A.2d 648 (App.Div.1984), involved a product-liability claim on behalf of a North Carolina resident who had died in North Carolina while operating a machine manufactured and designed in New Jersey. The court determined that "the principal aim of a product liability or other personal injury claim is fairly to compensate the injured party." *Id.* at 651, 475 A.2d 648. North Carolina chose not to extend strict-liability protection to products-liability suits. Thus, the court concluded that "there is no compelling reason for us to extend to such non-domiciliary plaintiffs the benefit of our decisional law." *Ibid.* In *Deemer* the fact that the machine was designed and manufactured in New Jersey was not enough to call for application of New Jersey law. However, in this case an explicit policy exists under the FCPA to prohibit not only domestic employees but foreign employees of domestic companies from bribing foreign officials. "It shall be unlawful for any domestic concern * * * or for any * * * employee * * * to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an * * * authorization of the payment of any money" or gift to any foreign official. 15 *U.S.C.A.* § 78dd–2(a) The foregoing is an explicit forum policy to affect the foreign situs, not just to deter domestic actions. *See also* 15 *U.S.C.A.* § 78dd–2(a)(2)(B) (subjecting employee of domestic concern who is United States citizen to maximum of five years of imprisonment for violating the FCPA).

Defendants also rely on *Henry v. Richardson–Merrell, Inc.,* 508 *F.*2d 28 (3d Cir.1975). In *Henry,* the plaintiff sued in New Jersey for damages resulting from the ingestion of thalidomide during pregnancy. Quebec was the place where the injury had occurred, the drug had been prescribed and consumed, the infant had been born, the parents had always resided, the company was licensed to do business, and the drug had been marketed. Quebec's limitations period had lapsed. New Jersey's contacts with the victim were limited. A small percentage (1.7%) of the United States testing of the drug had been conducted in New Jersey, and a subsidiary had manufactured the active ingredient in New Jersey. The court concluded that "New Jersey does not consider itself interested in nondomiciliary plaintiffs," *id.* at 35, whose legislatures have failed to provide similar protection, *id.* at 37, and dismissed the suit as time-barred under Quebec law. *Cf. Pine v. Eli Lilly & Co.,* 201 *N.J.Super.* 186, 492 *A.*2d 1079 (App.Div.1985) (applying New Jersey statute of limitations and "discovery rule" to New Jersey resident's tort action even though tort occurred in New York while plaintiff was New York domiciliary and New York statute of limitations had run).

D'Agostino asserts several facts that provide New Jersey with more than just minor contacts and interests despite his nondomiciliary status. Those include J & J's involvement in his hiring and firing, the worldwide management conference in New Brunswick, the Policy Statement against using corporate funds for unlawful purposes, and the alleged bribing of a foreign official. J & J's extensive oversight of Cilag and D'Agostino reveal more than the minor contacts and interests expressed in *Henry.* This is also not a case in which New Jersey seeks to regulate access to its courts by nondomiciliary plaintiffs; here it seeks to affect what is done in New Jersey by a domiciliary corporation.

In *Eger v. E.I. du Pont DeNemours Co.,* 110 *N.J.* 133, 539 *A.*2d 1213 (1988), a New Jersey resident who was working in South Carolina brought a third-party tort action. Under South Carolina law both the general contractor and subcontractor are immune from tort liability, while in New Jersey only the subcontractor is

immune from liability. We stated that "South Carolina has a genuine and legitimate interest in protecting the welfare of persons working within its borders, affixing responsibility for that protection, regulating the safety of the workplace, and allocating the financial costs resulting from employment accidents." *Id.* at 140, 539 *A.*2d 1213. We concluded that allowing a tort suit, by way of New Jersey law, against a South Carolina general contractor "would undermine the foundation of that state's workers' compensation statute." *Id.* at 141, 539 *A.*2d 1213. We found significant that the plaintiff would receive compensation through the workers' compensation system. We concluded that South Carolina had the more legitimate interest in the workers' compensation rights of people injured while employed in South Carolina and applied South Carolina law. Again, the domestic law of the New Jersey forum did not seek to regulate conduct there.

Switzerland has a strong interest in at-will employment, just as South Carolina has with workers' compensation law. However, New Jersey has a qualitatively different interest in protecting employees against wrongful discharges ordered by New Jersey corporations. In *Eger* we determined that a tort suit against a South Carolina general contractor would undermine South Carolina law. However, in this case the tort directly implicates a New Jersey company. Allowing New Jersey law to apply provides the fairness and certainty for the parties involved that we were concerned with in *Eger.* J & J, as a New Jersey company, is well aware of the FCPA and its dictates. In fact, it has its own Policy Statement against the use of corporate funds for unlawful purposes, including bribes or payoffs.

Incorporating the FCPA as a clear mandate of New Jersey policy does not undermine any valid expectation of J & J. Hence, we are not exporting New Jersey employment law so much as applying New Jersey domestic policy, drawn from federal sources, to a domestic company. As revealed in *Henry* and *Eger,* New Jersey law does not regulate conduct outside the state. Rather, New Jersey law regulates conduct in New Jersey, such as J & J's alleged orchestration of the bribing of a foreign official and firing

of plaintiff. To use an extreme example, we would not doubt that New Jersey law could interdict a criminal conspiracy, orchestrated in New Jersey, to harm interests elsewhere. *See N.J.S.A.* 2C:1–3(a)(3) (stating that conduct outside New Jersey can constitute conspiracy as long as one act in furtherance of conspiracy occurs in New Jersey).

Defendants also rely on *Shamley, supra,* 869 *F.*2d 167. In *Shamley* a New Jersey resident who worked in New York and was fired in New York sued for wrongful discharge under *Pierce* and for intentional infliction of emotional distress. New York law does not recognize a cause of action for wrongful discharge of an at-will employee. The employee had commuted to work in New York for fourteen years. The Second Circuit concluded that New York has a strong interest in maintaining a uniform approach to employer-employee relations, especially because many full-time New York employees are full-time residents of other states. *Ibid.* Therefore, the court held that under New York law the suit had been properly dismissed. Defendants' reliance on *Shamley,* however, is misplaced. We note that the corporation in *Shamley* was not a New Jersey company that may have ordered the discharge of the employee from New Jersey.

As we have stated, the question is not whether the *Pierce* policy is exportable (or follows a New Jerseyan everywhere), but whether a New Jersey policy has an intended and permissible extraterritorial effect. See discussion, *supra,* at 532–534, 628 *A.*2d at 314–315. In many (if not most) instances the forum policies are not intended to have extraterritorial effect. For example, we might consider the hypothetical case of a researcher forbidden by federal law to conduct fetal research in the United States who, as an employee of a foreign subsidiary of a New Jersey company, is ordered to do fetal research in Canada. The employee would not have a retaliatory-discharge claim based on the forum law because, unlike the FCPA, such a law would not seek to regulate conduct outside of the United States. A parent company in New Jersey that requires a Canadian employee of a subsidiary to do such research would not thereby violate a clear mandate of public

policy. The issue is always the policymaker's intent to affect extraterritorial events.

## IV

The remaining issues are more substantive and factual than they are choice-of-law issues. We understand why the Appellate Division might not find persuasive the inference that the plaintiff's termination had somehow been orchestrated in New Jersey and that plaintiff had taken direct instruction from J & J officers in New Jersey. However, we cannot resolve the factual dispute. Although acknowledging that those allegations provide New Jersey with some interest in the case, the Appellate Division concluded that they do not provide New Jersey with "'the *greatest interest* in having its law govern the particular matter in issue.'" 255 *N.J.Super.* at 323, 605 *A.*2d 252 (quoting *White v. Smith,* 398 *F.Supp.* 130, 134 (D.N.J.1975)).

By the same token, we cannot resolve the choice-of-law question on the basis that the Swiss Public Prosecutor, after a thorough investigation, found the bribery allegations to be unsubstantiated, and that the United States has its own stringent process for drug registration under the Federal Food, Drug and Cosmetic Act, 21 *U.S.C.A.* §§ 301 to 394. *Id.* at 324, 605 *A.*2d 252. Parenthetically, we note that if the Swiss Prosecutor had found a violation of Swiss law, that would not determine the choice-of-law question. The question is not just whether Dr. Preisig violated Swiss law; the question is whether J & J caused the firing of a subsidiary employee because that employee refused to participate in what appeared to him to be corporate bribery. Under the FCPA D'Agostino, as a United States citizen, faced a potential five-year imprisonment for bribing a foreign official. 15 *U.S.C.A.* § 78dd–2(g)(2)(B). "[A]n employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 *A.*2d 385, 389 (1980); *cf. Crossen, supra,* 537 *F.Supp.* at 1078 ("refusing to personally violate Thai law, and thereby subject

himself to the risk of imprisonment, establishes a cause of action for breach of the implied-in-law covenant of good faith and fair dealing").

J & J claims to have an absolute defense to a violation of the FCPA and by implication asserts that D'Agostino has an absolute defense as well. Under the FCPA an affirmative defense exists if the payment "was lawful under the written laws and regulations of the foreign official's * * * country." 15 *U.S.C.A.* § 78dd–2(c)(1). The Swiss Public Prosecutor found the bribery allegation unsubstantiated. We are now informed of facts concerning prior "gifts" of stock to Dr. Preisig not known to D'Agostino when he refused to sign the payment voucher. We are not evaluating the propriety of this form of conduct under Swiss law. We are informed, however, that Swiss regulatory practices were changed after the events giving rise to this suit. In any event,

> a plaintiff attempting to state a cause of action for retaliatory discharge after being fired for reporting possible illegal activity need not allege or prove conclusively the law has been violated in order to state a cause of action. Since under *Palmateer* this is the rule when an employee reports to law enforcement officials, it should certainly also be the rule that an employee with a reasonable belief that illegal activity is occurring should be able to report his belief to his superiors in an effort to ensure management's compliance with the law without fear of discharge.
> [*Johnson, supra,* 101 *Ill.Dec.* at 254, 498 *N.E.2d* at 578.]

*See also N.J.S.A.* 34:19–3 (providing cause of action for retaliatory discharge when employee "[o]bjects to, or refuses to participate in any activity, policy or practice which the *employee reasonably believes* " violates law or is crime (emphasis added)); *House v. Carter–Wallace, Inc.,* 232 *N.J.Super.* 42, 51, 556 *A.2d* 353 (App. Div.) (restating the requirement of reasonable belief), *certif. denied,* 117 *N.J.* 154, 564 *A.2d* 874 (1989).

Moreover, we do not decide the substantive questions in this case of what constitutes action sufficient to invoke the *Pierce* doctrine. *See id.* at 48–51, 556 *A.2d* 353 (discussing effective action by employee to express opposition to conduct that violates clear mandate of public policy; "action reasonably calculated to prevent the objectionable conduct"). We decide simply what law applies in a summary-judgment action when an overseas employee

alleges a wrongful discharge brought about in New Jersey by the parent company for an asserted refusal to participate in a bribe scheme that might have subjected the employee, as a United States citizen, to domestic criminal sanctions.

In an oral opinion, the trial court concluded that New Jersey law should govern. "Here a plot, through bribery of foreign officials, may have been hatched in New Jersey and when plaintiff refused to take part in the misdealings, he was dismissed. This dismissal had to have come at the behest of a local corporation." Although the case is very close, we agree with the trial court that New Jersey law governs this dispute. Switzerland has an interest in maintaining Swiss employment relationships. But that interest ought not be given precedence over domestic policies of a higher quality. We would be loath to say that the Swiss interest in employment stability is qualitatively greater than the domestic interest in negating foreign corrupt practices by New Jersey corporations.

D'Agostino has alleged sufficient qualitative contacts and interests to require the choice of New Jersey law for purposes of this summary-judgment motion. To make the choice-of-law determination prior to trial is always preferable, but the complexity of the facts to be proven at trial may not always allow such a choice to be made in advance. This is not a simple car-accident case in which the situs of the accident and residences of the parties are known and the choice-of-law decision easily determined on uncontested facts. Rather, this case involves "hotly disputed" facts which can be resolved only at trial. To resolve the qualitative nature of New Jersey's interest and contacts before a trial may simply not be possible. The choice-of-law issue may have to await final decision on the basis of the evidence presented and facts proven at trial.

## V

To sum up, that so much of what we have resolved in the past and that we resolve today must be on the basis of unresolved factual issues is regrettable. The J & J defendants enjoy an

exemplary reputation among New Jersey's business community—indeed, among the world's business community. The posture of the pleadings forces them and us to consider the qualitative strength of New Jersey's interest in this dispute on the worst-case scenario that may be drawn from the proofs. That scenario does not fit conveniently within our precedent. The case is not like *Veazey*, a motor-vehicle accident involving a Florida couple. Only the mere happenstance of travel brought that couple to New Jersey, and assuredly Florida had a vastly greater interest in the family relationship between the two parties before the court. This forum had no interest in the domestic relationships of that couple; this forum has, by the incorporation of federal policy, an interest in the overseas conduct of domestic companies that affects American citizens and interests at home and abroad.

Nor is it like *Eger*, in which New Jersey's interest was at least partially vindicated in the protection of its domiciliaries by the availability of an alternative remedy in the other forum. In this case no civil vindication of the clear mandate of policy against such overseas bribery exists except in New Jersey courts under New Jersey law.

This is an unusual case. It has aspects of both tort and contract law. In addition, the case involves both domestic and international concerns. As such, it does not fit easily within any of the conventional rubrics for choice of law. The *Restatement (Second) of Conflicts of Law* § 6 (1969) (hereinafter *Restatement*) provides an overview of the judicial function in its statement of choice-of-law principles. When no constitutionally-valid statutory directive guides a forum court, some factors relevant to the choice of the applicable rule of law include: "the needs of the interstate and international systems"; "the relevant policies of the forum"; "the protection of justified expectations"; and "certainty, predictability and uniformity of result." *Ibid.*

In a case as complex as this, we cannot assure certainty, predictability, and uniformity of result. In considering all of the other factors and the quality of New Jersey's interest in the

underlying controversy as well as this State's contacts with the controversy, we believe that as between Switzerland and this forum New Jersey has the greatest interest. In particular, we do not see how a domestic corporation could have any "justified expectations," *Restatement, supra,* § 6, that it was free to put at jeopardy overseas employees who refuse to participate in commercial bribery. In making such a ruling, we do not export New Jersey employment law to the overseas subsidiaries of domestic corporations. We incorporate a domestic policy intended to affect, at most here, conduct in New Jersey that has a forbidden extraterritorial effect. The allegations in this case present a distinct New Jersey involvement both in the hiring and firing of D'Agostino.

And if the domestic officers had nothing to do with D'Agostino's firing for failure to go along with the bribe, the case is truly closed. This is not a case in which the mandate of policy directly controls the employment relationship of a subsidiary, as it might be in the case of discriminatory domestic-hiring practice. *See Zieger v. Manhattan Coffee Co.*, 112 *Ill.App.*3d 518, 68 *Ill.Dec.* 200, 445 *N.E.*2d 844 (1983) (holding parent liable under Federal Age Discrimination in Employment Act). Rather, this is a case in which the violation of public policy arises from the parent's direct, not vicarious, interference with the forum policy.

The premise of plaintiff's case is that the J & J officials ordered and directed the plan to dismiss him; his case cannot hereafter be converted into one of *respondeat superior* or vicarious liability for the unplanned acts of Swiss managers. If the facts are as J & J asserts, the discharge will implicate only Swiss interests, and the case will be dismissed under applicable principles of Swiss law. If the facts are as plaintiff asserts, that the payments that he refused to make were intended to influence Swiss regulatory officials, an asserted violation of the FCPA, and if J & J ordered D'Agostino's discharge and employment quarantine for refusal to go along with the arrangement and its coverup, the case implicates important New Jersey interests that are qualitatively greater than the Swiss interest in employment relationships and therefore calls for the

application of domestic law. We repeat, however, what we said at the outset of the opinion: these are but D'Agostino's allegations that remain to be proven.

The judgment of the Appellate Division is reversed and the matter remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, DREIER, LONG and STEIN—7.